[This opinion has been published in *Ohio Official Reports* at 77 Ohio St.3d 284.]

ESTATES OF MORGAN ET AL., APPELLANTS, *v.* FAIRFIELD FAMILY COUNSELING CENTER ET AL., APPELLEES; BROWN, APPELLANT.

[Cite as *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 1997-Ohio-194.]

*Psychotherapists—Malpractice—Negligence—Outpatient kills his parents—Relationship between psychotherapist and patient in an outpatient setting constitutes a special relation justifying the imposition of a duty upon the psychotherapist to protect against and/or control the patient's violent propensities.*

1. Generally, a defendant has no duty to control the violent conduct of a third person as to prevent that person from causing physical harm to another unless a "special relation" exists between the defendant and the third person or between the defendant and the other. In order for a special relation to exist between the defendant and the third person, the defendant must have the ability to control the third person's conduct.

2. R.C. 5122.34 does not preclude the finding that a special relation exists between the psychotherapist and the outpatient which imposes a common-law duty on the therapist to take affirmative steps to control the patient's violent conduct.

3. The relationship between the psychotherapist and the patient in the outpatient setting constitutes a special relation justifying the imposition of a duty upon the psychotherapist to protect against and/or control the patient's violent propensities.

4. When a psychotherapist knows or should know that his or her outpatient represents a substantial risk of harm to others, the therapist is under a duty to exercise his or her best professional judgment to prevent such harm from occurring.

(No. 95-131—Submitted April 17, 1996 at the New Philadelphia Session—Decided January 22, 1997.)

APPEALS from the Court of Appeals for Fairfield County, No. 94CA11.

_____

{¶ 1} On the evening of July 25, 1991, Matt Morgan was playing cards with his parents, Jerry and Marlene Morgan, and sister, Marla Morgan. Matt excused himself from the table, went upstairs, and obtained a gun. He came back downstairs and shot and killed his parents and seriously injured his sister. During the previous year, Matt had been examined by or received counseling from various mental health

professionals who were either employed by or served as consultants to appellee, the Fairfield Family Counseling Center ("FFCC"). This case involves the liability of those mental health professionals and FFCC for the injuries and deaths resulting from the tragic events of July 25, 1991.

{¶ 2} During his senior year of high school, Matt began to have difficulties at school, work, and home. His grades and attendance at school had fallen, and he was required to attend summer school. He had problems keeping jobs, and became disrespectful and verbally abusive toward his parents, to the point where his parents had grown afraid of him. These problems continued after high school until January 1990, when Matt was removed from his parents' home in Lancaster, Ohio, by police after wanting to fight his father.

{¶ 3} Matt then drifted, homeless, until he presented himself at the Emergency Room at Thomas Jefferson University Hospital in Philadelphia, Pennsylvania, on March 26, 1990. There, he was diagnosed as suffering from schizophreniform disorder and transported to C.A.T.C.H. Emergency Evaluation Center ("EEC"), a mental health facility. Matt was further evaluated at C.A.T.C.H. EEC between March 26, 1990 and March 29, 1990. It was noted that Matt had "recent drifting, travel and homelessness," and "[n]eeded to be put out of [his] parents' home by police." Various symptoms were noted suggestive of either schizophreniform disorder or schizophrenia, including Matt's belief that the government was affecting his body and the air waves, such that he was unable to watch television or listen to tapes or the radio, delusions of persecution and ideas of reference and thought broadcasting. Matt was prescribed Navane, an antipsychotic or neuroleptic drug, and on March 29, 1990, was admitted to the C.A.T.C.H. Respite.

{¶ 4} At the C.A.T.C.H. Respite, Matt came under the care of Miles C. Ladenheim, M.D., who, at that time, was in his third year of psychiatric residency. Dr. Ladenheim first saw Matt on April 2, 1990, at which time he rendered a primary diagnosis of "schizophreniform disorder, rule out schizophrenia, chronic paranoid type." The essential features of schizophreniform disorder are identical to those of schizophrenia, with the exception that the duration is less than six months. Once the signs and symptoms persist for a continuous period of six months, the diagnosis becomes schizophrenia. Schizophrenia is an inability to recognize reality in some way, marked by delusions and perceptual distortions. There is no cure for schizophrenia, but the symptoms can be controlled by medication such as Navane. It was Dr. Ladenheim's opinion that "it was only going to be a matter of time before the six-month period elapsed, and he [Matt] would likely then have schizophrenia."

{¶ 5} Dr. Ladenheim determined that Matt had developed a fixed paranoid delusional system involving his family, the government, unspecified industry and others, including the delusion that he had a "big lawsuit case in both Ohio and Florida, suing his family, aunts, uncles, and some other people," and somatic delusions regarding his legs. Dr. Ladenheim also noted that Matt had an unformed paranoid ideation, ideas of reference from the television and feelings of thought control by others. He noted that Matt also "had feelings of thought manipulation, meaning his thoughts were being manipulated by outside forces or people, and thought withdrawal, meaning that people were able to take thoughts out of his head, and thought reading, meaning that people were able to read his thoughts." Dr. Ladenheim also made a note on April 30, 1990, that prior to leaving Ohio, Matt was becoming increasingly agitated at home and was put out of his parents' home after threatening them.

{¶ 6} Matt's art therapist at the Respite noted that Matt had an increased feeling of stress when feelings of anger were discussed. After referring to a particular example of anger in a drawing of a gun made by Matt on or about April 20, 1990, she stated that "[t]his, coupled with aggressive line quality, indicates possible anger toward self and others."

{¶ 7} During his twelve-week admission at the Respite, Matt was treated with intensive therapy, Navane, and other medications to aid in sleeping and to offset the potential side effects of the Navane. Eventually, Matt's paranoia regarding his family decreased and he developed improved insight into his mental illness. Dr. Ladenheim explained that Matt's illness could be controlled by medication, and Matt agreed that the medication was helping him and that his symptoms of mental illness may have contributed to his conflicts, especially with his father. Matt began to make contacts with his family and they expressed a willingness to help him. It was Dr. Ladenheim's opinion that Matt should return to his parents' home, but that the treatments and medication must continue in order for Matt to safely return to Ohio. Accordingly, the staff at the Respite contacted defendant-appellee FFCC, and Matt was picked up by his parents on June 22, 1990.

{¶ 8} Matt initially presented himself to FFCC on July 16, 1990. After an intake evaluation was conducted by defendant-appellee, Ronald Gussett, Ph.D., Matt was referred for consultation with defendant-appellant, Harold T. Brown, M.D., a consultant contract psychiatrist to FFCC. Dr. Brown first saw Matt at FFCC on July 19, 1990. From his thirty-minute evaluation of Matt, Dr. Brown noted that Matt was "recently discharged from a mental health unit of some sort in Philadelphia, Pennsylvania, on Elavil and Navane. He is out of medication. He comes to the mental health clinic for his medication, continued care and help in

completing a Social Security Disability form." Dr. Brown also noted that "[h]is [Matt's] experience in Philadelphia sounds like some sort of acute atypical psychosis. He does not present indicators of thought disorder or schizophrenia at this point."

{¶ 9} Dr. Brown did not make any final determination as to Matt's condition at that time, but did make a notation to "rule out malingering" because of a discrepancy between Matt's complaint that his legs are of different lengths and Dr. Brown's observation that Matt's gait and movements were normal, "and that there was a disability form in the works somewhere." Dr. Brown testified that he sees "a lot of people that show up with SSI in mind with a history very similar to Mr. Morgan's. And I think to give it to someone who doesn't qualify for it is a real disservice to them." However, Dr. Brown thought it wise to defer his diagnosis, continue the medication, obtain Matt's records from Philadelphia, and schedule another appointment for a month later.

{¶ 10} On August 16, 1990, Matt kept his scheduled appointment with Dr. Brown. Dr. Brown was now in possession of the C.A.T.C.H. records, but it is clear from his testimony that he never read them and never attempted to contact Dr. Ladenheim. Instead, during this fifteen-minute session, Dr. Brown began to focus more on there being "a strong factor of malingering here or at least overstating symptoms to gain the SSI," and reduced Matt's Navane medication by half.

{¶ 11} The next and last time Dr. Brown saw Matt was for fifteen minutes on October 11, 1990. Dr. Brown noted as follows:

"We discussed his migration from Ohio to Florida to Philadelphia and back to Lancaster. He now chooses to view it as his extended vacation. No further insight as to just what happened to get him into the mental hospital in Philadelphia or why they may have prescribed neuroleptic [medication] for him.

"We discussed a plan to further taper the Navane. He is now taking only one 10 milligram capsule a day for the last five to six weeks. When this present supply is gone, he is to take a 5 milligram capsule once a day for a month and then discontinue. He will continue with Dr. Gussett in psychotherapy as Dr. Gussett and he both deem it useful.

"He is referred to job counselor, Nancy Lambert, for what help this may be in finding employment.

"Diagnosis for the record will be that of atypical psychosis, not further specified, in remission."

{¶ 12} Dr. Brown testified that "[t]he diagnosis of atypical psychosis is kind of a waste basket diagnosis when you think there's been a psychotic episode, but the information is not sufficient to make a clear specific diagnosis. And I didn't

4

feel the information that I had or my observations of Matt were sufficient to make a specific diagnosis at that time."

{¶ 13} According to Dr. Brown, he had no "line of authority or control" at FFCC. The "style of practice" there did not allow him to "do the supportive cycle therapy, the verbal communication treatment modalities." He felt, therefore, that the responsibility of monitoring Matt's condition after October 11, 1990, fell on FFCC. He assumed that if "the counselor notices something going bad, they'll refer [the patient] back to me, something that they think medication will help with." Otherwise, Dr. Brown would not follow up on a patient's progress, even though he had terminated the patient's medication.

{¶ 14} Between October 1990 and January 1991, Matt continued psychotherapy and vocational counseling at FFCC. He received psychotherapy from Dr. Gussett and vocational counseling from defendant-appellee Nancy J. Lambert, LPC. During this time, however, Matt's medication ran out and his mother informed Lambert that Matt's condition was beginning to deteriorate. Mrs. Morgan reported that Matt was pacing, that he was quiet, withdrawn and moody, that his eating habits had changed, that he was becoming sick like he was before being hospitalized, and that he was regressing and needed to go back on medication. Mrs. Morgan also reported that Matt had made a deposit on the purchase of a gun.

{¶ 15} Lambert, however, "thought that she [Marlene] was somewhat of an overprotective and controlling mother," "that she was worrisome, * * * seemed to be overly involved and overly concerned with Matt * * * and also * * * I had some question as to whether maybe she exaggerated." When Matt failed to appear for an appointment scheduled with Dr. Gussett in January 1991, Dr. Gussett and Lambert decided that Matt would continue to see only Lambert.

{¶ 16} After January, Lambert continued as Matt's vocational counselor, and Matt's condition deteriorated further. He again became verbally abusive toward his parents, called them names, insulted them, and wanted to fight his father. On one occasion, Matt was getting ready to punch his father in the back of the head, but his father turned around in time to avoid it. Matt would throw food away after indicating he was hungry, saying it wasn't fit to eat, complained of his legs hurting when nothing was wrong with them, talked to himself, and was observed telling someone to be quiet when no one was in the room with him. On one occasion he began striking a telephone pole repeatedly with a baseball bat. His parents were again becoming afraid of him. He began to lose a lot of weight, complained of an aerial attack on his head, and exhibited signs of paranoia. His parents felt threatened by him.

{¶ 17} Mrs. Morgan contacted Lambert several times during May 1991 to report these symptoms. Lambert scheduled Matt for an appointment with Dr. Brown, but Matt, by now apparently resistant to taking medication and therapy, failed to keep the appointment. Also, in a phone conversation on May 29, Matt's employer reported to Lambert that Matt was too weak to push a lawnmower, was on the verge of passing out, and did not seem to be totally in touch with reality.

{¶ 18} On May 30, 1991, Lambert conducted an emergency assessment, and apparently concluded that Matt was not a candidate for involuntary hospitalization. This assessment and the decision were made entirely by Lambert without the assistance of a psychiatrist.

{¶ 19} On June 14, Mrs. Morgan sent a letter to FFCC seeking further help regarding her son's deteriorating condition. She specifically stated that she was concerned that Matt may become violent. Matt was again evaluated for involuntary hospitalization on July 3 and again it was determined that he did not satisfy the requirements for hospitalization. This time the assessment was conducted by Lambert and defendant-appellee William C. Reid, a licensed social worker. This was the last time Matt was seen at FFCC.

{¶ 20} At the time of this assessment and the one conducted on May 30, FFCC had an unwritten policy that it would not initiate involuntary hospitalization proceedings, but would become involved only after such proceedings were initiated by the family of the patient. However, Matt's parents had attempted to initiate involuntary commitment proceedings, but the probate court informed them that it would need Lambert's approval.

{¶ 21} On July 20, 1991, Mr. and Mrs. Morgan sent a letter to defendant-appellee, L. Patrick McGovern, Ph.D., a psychologist employed by FFCC at the time, again asking for help. Dr. McGovern reviewed Matt's chart, spoke briefly with Lambert and Reid, and concluded that Matt could not be hospitalized or given medication against his will. Dr. McGovern then spoke with Matt's parents on July 23 and July 25 and informed them of his conclusion. The last entry in Matt's chart at FFCC was made by defendant-appellee, Barbara K. Sharp, a licensed social worker employed by FFCC who, after speaking with Dr. McGovern on July 25, noted that "it is apparent that Matt is losing weight and decompensating. FFCC is unable to assist since he refuses medication or psychiatric care." It was that evening that Matt shot his parents and sister.

{¶ 22} In June 1992, Matt Morgan was found not guilty by reason of insanity of two counts of aggravated murder with specification, one count of felonious assault with specification, and one count of attempted murder with specification.

{¶ 23} On July 17, 1992, Jan E. Sholl, as executor of the Estates of Jerry and Marlene Morgan, and Marla Morgan, plaintiffs-appellants, instituted this action against Dr. Brown, FFCC, and its employees, alleging that their negligence in treating Matt was the proximate cause of Jerry's and Marlene's death and Marla's injuries.[1]

{¶ 24} During pretrial discovery, plaintiffs' experts testified that Dr. Brown, FFCC, and its employees had substantially deviated from accepted standards of medical care in the treatment of Matt, which deviation resulted in the deaths of Jerry and Marlene and the injuries to Marla. Dr. Donald C. Goff testified that Dr. Brown's treatment of Matt was negligent in that Dr. Brown failed to diagnose schizophrenia, failed to obtain an adequate history, failed to read the C.A.T.C.H. records and to contact Dr. Ladenheim, discontinued Matt's medication, failed to monitor Matt after his medication was discontinued, and improperly delegated the duty to monitor Matt's condition to FFCC. Dr. Goff further testified that it was predictable, in light of the C.A.T.C.H. records, that during the year following the tapering of Matt's medication, "he would be at risk for conflict with the parents and potential violence"; that Matt's risk for violence is directly related to his level of psychosis; that as long as he was being treated with medication, that risk was substantially reduced; that had Matt remained on medication between October 1990 and June 1991, "he would not have pulled the trigger"; and that Dr. Brown's actions did contribute to the shootings of July 25, 1991.

{¶ 25} Dr. Goff also opined that Matt was committable by June 14, 1991, and particularly faulted FFCC in that "a vocational therapist has no business making decisions about what is appropriate and what's not appropriate in terms of involuntary hospitalization."

{¶ 26} Dr. Emmanuel Tanay testified similarly to Dr. Goff. In particular, as to Dr. Brown, Dr. Tanay testified that when Dr. Brown withdrew Matt's medication in October 1990, it was foreseeable that, without his medication, Matt posed "a danger of violence, that there is a danger of homicide, arson, suicide. * * * I [Tanay] couldn't predict a specific event. And I wouldn't do so. But I could make a prognosis. I could say that it is an event that, if untreated, may take place with considerable likelihood"; and that the only reason Matt killed his parents is because he was taken off medication and didn't receive good care.

{¶ 27} As to FFCC, Dr. Tanay was somewhat more graphic in his criticisms:

---

1. The Fairfield County Mental Health Board was also named as a defendant below, but was subsequently dismissed from the action. In addition, Matt Morgan himself brought a claim for medical negligence, which remains pending in the trial court. However, the trial court certified this action pursuant to Civ.R. 54(B).

"My opinion is that the Center as an entity was at the very most equipped to provide counseling for people with problems in living. But it was not equipped to deal with psychotics. It had neither the resources, and I would even believe not even the interest, in providing care for psychotics. It is my view, just so you know exactly my view, that psychotics were used, exploited to get funds, but they were provided virtually no meaningful care, they were looked after by case managers, some of whom, according to the testimony that I have read, had as many as 105 clients."

{¶ 28} Dr. Tanay also testified that no one employed by FFCC, including Drs. Gussett and McGovern, was equipped to deal with schizophrenics, either in terms of referring Matt to Dr. Brown for medication or in rendering a decision regarding involuntary hospitalization. In particular, Dr. Tanay testified:

"When I think of her [Lambert's] testimony, my blood pressure raises about 30 points. * * * I think her behavior in this case was outrageous. She is a vocational counselor. She took it upon herself to make medical decisions.

"* * * She has as much business * * * making emergency assessments of a psychotic individual as I have to fly a jumbo jet. She has no training, no education along this line.

"* * * These alarmed parents call her and tell her of their concerns, and she tells them that this psychotic individual does not meet the criteria. Who is she to make that kind of a decision that he doesn't meet the criteria? In any institution that I know, physicians who have one or two years of psychiatric training are often not permitted to make such decision and a senior member of the staff has to make [it]. And here is a person who has no training of any kind in the field of psychiatry or medicine making medical decisions."

{¶ 29} Dr. Tanay expressed similar criticisms of Reid, stating that "[t]hese two people had no business doing what they were doing."

{¶ 30} In addition, Dr. Tanay opined that the "combination of a psychiatrist unable to make a diagnosis of serious mental illness, and a facility staffed by non-medical personnel, was a disaster waiting to happen. * * * [W]e have here a setup, an organizational structure that cannot help but result in tragic consequences."

{¶ 31} The trial court entered summary judgment in favor of Dr. Brown, FFCC, and its employees. The court of appeals reversed the trial court's judgment as to Dr. Brown, but affirmed it as to FFCC and its employees.

{¶ 32} The cause is now before this court pursuant to the allowance of discretionary appeals.

_____

*Leeseberg, Maloon, Schulman & Valentine* and *Jeffrey L. Maloon*, for appellants Estates of Jerry L. and Marlene F. Morgan.

*Mazanec, Raskin & Ryder Co., L.P.A., John T. McLandrich* and *Richard A. Williams*, for appellees.

*Reminger & Reminger Co., L.P.A.,* and *Mark E. Defossez*, for appellant Harold T. Brown, M.D.

*McCarthy, Palmer, Volkema, Boyd & Thomas* and *Michael S. Miller*, urging affirmance for *amicus curiae*, Ohio Academy of Trial Lawyers.

*Richard M. Epps*, urging affirmance as to appellees for *amicus curiae*, Ohio Council of Community Mental Health and Recovery Organizations.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 33} In *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 529 N.E.2d 449, this court determined that under certain circumstances a psychiatrist can be held liable for the violent acts of a voluntarily hospitalized patient following the patient's release from the hospital. The question left open in *Littleton*, however, was "whether a psychiatrist's duty to protect a person from the violent propensities of the psychiatrist's patient extends to the outpatient setting. See, generally, *Tarasoff v. Regents of the University of California* (1976), 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334." *Littleton*, 39 Ohio St.3d at 92, 529 N.E.2d at 455, fn. 3. This is the issue we must decide today.

I

"SPECIAL RELATION" AND THE DUTY TO CONTROL

{¶ 34} It is by now an axiom that duty is an essential element of a cause of action for negligence. See *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 180, 472 N.E.2d 707, 710. See, also, Prosser & Keeton on Torts (5 Ed.1984) 164, Section 30. In Ohio, "[t]he existence of a duty depends on the foreseeability of the injury. * * * The test for foreseeability is whether a reasonably prudent person would have anticipated that an injury was likely to result from the performance or nonperformance of an act." (Citations omitted.) *Menifee, supra*, 15 Ohio St.3d at 77, 15 OBR at 180, 472 N.E.2d at 710. See, also, *Hill v. Sonitrol of Southwestern Ohio, Inc.* (1988), 36 Ohio St.3d 36, 39, 521 N.E.2d 780, 783. In addition, it is generally recognized that where the defendant "in fact has knowledge, skill, or even intelligence superior to that of the ordinary person, the law will demand of that person conduct consistent with it." Prosser & Keeton on Torts, *supra*, at 185, Section 32.

{¶ 35} However, foreseeability alone is not always sufficient to establish the existence of a duty. This court has followed the common-law rule, as set forth

at 2 Restatement of the Law 2d, Torts (1965) 116-130, Sections 314 to 319, that there is no duty to act affirmatively for another's aid or protection absent some "special relation" which justifies the imposition of a duty. *Littleton, supra*, 39 Ohio St.3d at 92, 529 N.E.2d at 455; *Hill, supra*, 36 Ohio St.3d at 39, 521 N.E.2d at 784; *Gelbman v. Second Natl. Bank of Warren* (1984), 9 Ohio St.3d 77, 79, 9 OBR 280, 281-282, 458 N.E.2d 1262, 1263.

{¶ 36} Restatement Section 314 states the general rule that there is no duty to act affirmatively for another's aid or protection.[2] Section 315 "is a special application of the general rule stated in § 314." 2 Restatement of Torts, *supra*, at 122, Section 315, Comment *a*. It provides that there is no duty to control the conduct of a third person to prevent him from causing physical harm to another unless a "special relation" exists between the defendant and the third person or between the defendant and the other. Sections 316 to 319 set forth the relations between the defendant and the third person which require the defendant to control the third person's conduct. In *Littleton, supra*, 39 Ohio St.3d at 92-93, 529 N.E.2d at 455, we relied on Section 319 of the Restatement in finding that a special relation exists between a psychiatrist and his patient in the hospital setting. Section 319 states that:

"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to

---

2. The rule has its genesis in the early common-law distinction between "misfeasance" and "nonfeasance." While there is a duty to refrain from active misconduct working positive injury on others, there is no duty to take affirmative action to aid or protect another from harm. Regardless of the gravity of danger threatening the potential victim, or the relative ease with which the danger can be averted, the traditional rule simply refuses to impose a moral obligation upon a stranger. Thus, *e.g.*, the expert swimmer, with a boat and rope at his disposal, who sees another drowning before his eyes, is under no obligation to help him. Instead he may sit on the dock and watch the man drown. Similarly, an ordinary bystander is under no duty to rescue a child drowning in what he knows to be shallow water, or to prevent a neighbor's child from hammering on a dangerous explosive. Such decisions have been condemned by legal writers as "shocking in the extreme," "revolting to any moral sense," and representative of "an attitude of rugged, perhaps heartless individualism." Nevertheless, because of the difficulties of setting moral standards and devising workable rules to cover all situations, the rule remains the law. See 2 Restatement of Torts, *supra*, at 116-117, Section 314, Comment *c*; Prosser & Keeton on Torts, *supra*, at 375-376, Section 56; 3 Harper, James & Gray, The Law of Torts (2 Ed.1986) 718-719, Section 18.6; Harper & Kime, The Duty to Control the Conduct of Another, *supra*, 43 Yale L.J. 886, 887.

The American Law Institute explains, however, that "[i]t appears inevitable that, sooner or later, such extreme cases of morally outrageous and indefensible conduct will arise that there will be further inroads upon the older rule." 2 Restatement of Torts, *supra*, at 117, Section 314, Comment *c*. At least two courts have already imposed a duty to summon aid for the benefit of another. In *Soldano v. O'Daniels* (1983), 141 Cal.App.3d 443, 449, 190 Cal.Rptr. 310, 314, the court felt it was "time to re-examine the common law rule of nonliability for nonfeasance in the special circumstances of the instant case." In concluding, the court stated that "[t]he imposition of liability on the defendant in this case * * * is but a slight departure from the 'morally questionable' rule of nonliability for inaction absent a special relationship." *Id.*, 141 Cal.App.3d at 455, 190 Cal.Rptr. at 318. In *Griffith v. Southland Corp.* (1992), 94 Md.App. 242, 257, 617 A.2d 598, 606, the court explained that "there is no precedent which permits a bystander to refuse to call 911 when not exposed to imminent danger. Even if there were such an uncivilized and shocking principle, blind allegiance would invite disdain and disrespect for the courts."

exercise reasonable care to control the third person to prevent him from doing such harm."

{¶ 37} The issue, therefore, becomes whether the relationship between a psychotherapist and the outpatient constitutes a "special relation" which imposes a duty upon the psychotherapist to protect others against and/or control the patient's violent conduct.

{¶ 38} In *Tarasoff, supra*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, the Supreme Court of California found that the psychotherapist-outpatient relationship constitutes such a special relation. In so finding, the court did not engage in a traditional Restatement analysis. Under a traditional Restatement analysis, Section 319 would take center stage. In *Tarasoff*, the court treated Section 315 *et seq.* as reflective of an overall principle that affirmative duties to control should be imposed whenever the nature of the relationship warrants social recognition as a special relation. *Id.*, 17 Cal.3d at 435, 131 Cal.Rptr. at 23, 551 P.2d at 343. In this way, the court subjected Section 315 to an expansive reading. Thus, the court noted that "courts have increased the number of instances in which affirmative duties are imposed not by direct rejection of the common law rule [of nonliability for nonfeasance], but by expanding the list of special relationships which will justify departure from that rule."[3] *Id.* at fn. 5.

{¶ 39} The court then engaged in a two-part analysis. First, the court drew an analogy to cases which have imposed a duty upon physicians to diagnose and warn about their patient's contagious disease, and concluded that " 'by entering into a doctor-patient relationship the therapist becomes sufficiently involved to assume some responsibility for the safety, not only of the patient himself, but also of any third person whom the doctor knows to be threatened by the patient.' " *Id.*, 17 Cal.3d at 437, 131 Cal.Rptr. at 24, 551 P.2d at 344, quoting Fleming & Maximov, The Patient or His Victim: The Therapist's Dilemma (1974), 62 Cal.L.Rev. 1025, 1030.

{¶ 40} Second, the court weighed various public policy concerns, concluding that the public interest in safety from violent assaults outweighs the countervailing interests of safeguarding the confidential character of psychotherapeutic communications and the difficulty inherent in forecasting dangerousness. *Id.*, 17 Cal.3d at 437-443, 131 Cal.Rptr. at 24-28, 551 P.2d at 344-348.

---

3. This analysis has prompted some discussion by legal scholars over whether and to what extent *Tarasoff* affects traditional notions of duty. See, *e.g.*, Lake, Revisiting *Tarasoff* (1994), 58 Albany L.Rev. 97; Adler, Relying Upon the Reasonableness of Strangers: Some Observations about the Current State of Common Law Affirmative Duties to Aid or Protect Others, 1991 Wis.L.Rev. 867, 886-898; Murphy, Evolution of the Duty of Care: Some Thoughts (1981), 30 DePaul L.Rev. 147, 169-176.

{¶ 41} The court held, therefore, that:

"When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reasonably necessary under the circumstances." *Id.*, 17 Cal.3d at 431, 131 Cal.Rptr. at 20, 551 P.2d at 340.

{¶ 42} Since *Tarasoff,* a majority of courts that have considered the issue have concluded that the relationship between the psychotherapist and the outpatient constitutes a special relation which imposes upon the psychotherapist an affirmative duty to protect against or control the patient's violent propensities. Recognizing that the duty is imposed by virtue of the relationship, these courts acknowledge that the duty can be imposed not only upon psychiatrists, but also on psychologists, social workers, mental health clinics and other mental health professionals who know, or should have known, of their patient's violent propensities. The courts do not impose any single formulation as to what steps must be taken to alleviate the danger. Depending upon the facts and the allegations of the case, the particular psychotherapist-defendant may or may not be required to perform any number of acts, including prescribing medication, fashioning a program for treatment, using whatever ability he or she has to control access to weapons or to persuade the patient to voluntarily enter a hospital, issuing warnings or notifying the authorities and, if appropriate, initiating involuntary commitment proceedings.

{¶ 43} Most of the courts engage in a *Tarasoff*-type analysis by which Section 315 is subjected to an expansive reading. Others find a duty to exist under the rule stated in Section 319. Collectively, they recognize that there are various levels of being in "control" pursuant to Section 315, or being in "charge" pursuant to Section 319, with corresponding degrees of responsibility for the patient's violent actions. Thus, although the psychotherapist may have less ability to control the patient in the outpatient setting than in the hospital setting, this lesser degree of control is not held to justify a blanket negation of the duty to control.

{¶ 44} Generally, the courts focus their attention on balancing the countervailing public interests that were weighed in *Tarasoff*, including the additional concern that patients be placed in the least restrictive environment and that nonviolent patients not be subjected to hospitalization against their will in an effort to avoid liability. These courts conclude that the interests of society to be

protected against the violent acts of mental patients outweigh the concerns of confidentiality, overcommitment, and difficulty of predicting violent acts. *Hamman v. Maricopa Cty.* (1989), 161 Ariz. 58, 775 P.2d 1122; *Schuster v. Altenberg* (1988), 144 Wis.2d 223, 424 N.W.2d 159; *Evans v. Morehead Clinic* (Ky.App.1988), 749 S.W.2d 696; *Bardoni v. Kim* (1986), 151 Mich.App. 169, 390 N.W.2d 218; *Peck v. Counseling Serv. of Addison Cty., Inc.* (1985), 146 Vt. 61, 499 A.2d 422; *Brady v. Hopper* (C.A.10, 1984), 751 F.2d 329; *Lundgren v. Fultz* (Minn.1984), 354 N.W.2d 25; *Lipari v. Sears, Roebuck & Co.* (D.C.Neb.1980), 497 F.Supp. 185; *Jablonski v. United States* (C.A.9, 1983), 712 F.2d 391; *McIntosh v. Milano* (1979), 168 N.J.Super. 466, 403 A.2d 500. See, also, Annotation, Liability of One Treating Mentally Afflicted Patient for Failure to Warn or Protect Third Persons Threatened by Patient (1978), 83 A.L.R.3d 1201; 2 American Jurisprudence, Proof of Facts 3d (1988) 327; Sear, The Psychotherapist's Duty to Warn (1990), 40 Fedn. of Ins. & Corporate Counsel Qtrly. 406, 416-418.

{¶ 45} In addition, a number of courts have relied on *Tarasoff* in finding that a psychotherapist can be held liable for the violent acts of a patient following the patient's release from the hospital. *Wofford v. E. State Hosp.* (Okla.1990), 795 P.2d 516; *Naidu v. Laird* (Del.1988), 539 A.2d 1064; *Petersen v. State* (1983), 100 Wash.2d 421, 671 P.2d. 230; *Chrite v. United States* (E.D.Mich.1983), 564 F.Supp. 341; *Bradley Ctr., Inc. v. Wessner* (1982), 250 Ga. 199, 296 S.E.2d 693. See, also, Annotation, Liability of One Releasing Institutionalized Mental Patient for Harm He Causes (1971), 38 A.L.R.3d 699. See, also, *Div. of Corr., Dept. of Health & Social Serv. v. Neakok* (Alaska 1986), 721 P.2d 1121 (parolee case relying on *Tarasoff*).

{¶ 46} The parties do not dispute that the psychotherapist-outpatient relationship justifies the imposition of a common-law duty upon the psychotherapist to control the violent propensities of the patient. In fact, Dr. Brown readily admits that "[i]n *Tarasoff, supra*, the Supreme Court of California set then-novel but reasonable parameters on a psychotherapist's liability for violent acts of outpatients." However, our research discloses that *Tarasoff* does not enjoy universal acceptance. Some courts have concluded that the typical psychotherapist-outpatient relationship lacks sufficient elements of control necessary to satisfy Sections 315 and/or 319. These courts reason that the duty to control is corollary to the right, power, or ability to control, and criticize *Tarasoff* for not specifically addressing the issue of a psychotherapist's control over the outpatient. In addition, some of these courts find that public policy militates against the imposition of a duty in the outpatient setting. *Boynton v. Burglass* (Fla.App.1991), 590 So.2d 446, 448-449; *Santa Cruz v. Northwest Dade Community Health Ctr., Inc.*

(Fla.App.1991), 590 So.2d 444, 445; *Wagshall v. Wagshall* (1989), 148 A.D.2d 445, 447, 538 N.Y.S.2d 597, 598-599; *King v. Smith* (Ala.1989), 539 So.2d 262; *Currie v. United States* (C.A.4, 1987), 836 F.2d 209, 213; *Cooke v. Berlin* (1987), 153 Ariz. 220, 224-225, 735 P.2d 830, 834-835; *Hasenei v. United States* (D.Md.1982), 541 F.Supp. 999, 1009. See, also, Stone, The *Tarasoff* Decisions: Suing Psychotherapists to Safeguard Society (1976), 90 Harv.L.Rev. 358, 365-366; Note, Affirmative Duty After *Tarasoff* (1983), 11 Hofstra L.Rev. 1013, 1029-1030.

{¶ 47} In light of the opposing views on the subject, we deem it necessary to resolve the issue of duty in the outpatient setting by balancing the various factors which are the focus of judicial attention on both sides of the issue. These factors consist of the following: (1) the psychotherapist's ability to control the outpatient; (2) the public's interest in safety from violent assault; (3) the difficulty inherent in attempting to forecast whether a patient represents a substantial risk of physical harm to others; (4) the goal of placing the mental patient in the least restrictive environment and safeguarding the patient's right to be free from unnecessary confinement; and (5) the social importance of maintaining the confidential nature of psychotherapeutic communications. See *Littleton, supra*, 39 Ohio St.3d at 93-94, 97-98, 529 N.E.2d at 456-457, 459. See, also, *Perreira v. State* (Colo.1989), 768 P.2d 1198, 1214-1215.

A

{¶ 48} In weighing these factors, we must bear in mind that duty is not an immutable concept, nor is it grounded in natural law. As Prosser & Keeton explains, "[t]he statement that there is or is not a duty begs the essential question—whether the plaintiff's interests are entitled to legal protection against the defendant's conduct. * * * '[D]uty' is not sacrosanct in itself, but is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." Prosser & Keeton on Torts, *supra*, at 357-358, Section 53. Thus, " 'duty' is only a word with which we state our conclusion, and no more." *Id.* at 281, Section 43.

{¶ 49} Accordingly, there is no more magic inherent in the conclusory term "special relation" than there is in the term "duty." Both are part and parcel of the same inquiry into whether and how the law should regulate the activities and dealings that people have with each other. As society changes, as our sciences develop and our activities become more interdependent, so our relations to one another change, and the law must adjust accordingly. "Duty" is not a rigid formalistic concept forever embedded in the standards of a simplistic yesteryear. Relations perhaps regarded as tenuous in a bygone era may now be of such importance in our modern complicated society as to require certain assurances that

risks associated therewith be contained. These principles do not shed their inherent flexibility when applied in the context of a defendant's duty to control the violent conduct of a third person. See *Lipari, supra*, 497 F.Supp. at 192-193; *McIntosh,* 168 N.J.Super. at 495, 403 A.2d at 515; *Tarasoff,* 17 Cal.3d at 442, 131 Cal.Rptr. at 27-28, 551 P.2d at 347-348; Prosser & Keeton on Torts, *supra*, at 356-358, Section 53; Harper & Kime, The Duty to Control the Conduct of Another (1934), 43 Yale L.J. 886, 904-905.

B

{¶ 50} There is indeed a current running through the relevant Restatement sections that in order for a special relation to exist between the defendant and the third person, the defendant must have the ability to control the third person's conduct. Moreover, the cases from which these sections derive indicate that the ability to control is not the fictitious control which provides the basis for vicarious liability. Instead, "control" is "used in a very real sense." Harper & Kime, The Duty to Control the Conduct of Another, *supra*, 43 Yale L.J. at 891. Further, it would be tantamount to imposing strict liability to require the defendant to control a third person's conduct where he lacks the ability to do so.

{¶ 51} However, those courts which find the ability to control to be lacking in the outpatient setting tend to take a rather myopic view of the level or degree of control needed to impose the duty. They appear to assume that in order to satisfy Section 315 in general, or Section 319 in particular, there must be actual constraint or confinement, whereby the third person's physical liberty is taken away or restricted.[4] In viewing the issue in this way, these courts fail to recognize that the duty to control the conduct of a third person is commensurate with such ability to control as the defendant actually has at the time. See, *e.g.*, 2 Restatement of Torts, *supra*, at 116, Section 314, Comment *a*; at 124, Section 316, Comments *a* and *b*; at 126, Section 317, Comment *c*; and at 127, Section 318, Comment *a*. See, also, *Lundgren,* 354 N.W.2d at 27-28; *McIntosh, supra*, 168 N.J.Super. at 483, 403 A.2d at 508-509, fn. 11. In other words, it is within the contemplation of the Restatement

---

4. For example, in *Hasenei, supra*, 541 F.Supp. at 1009-1010, the court supported its conclusion by observing that "lack of control by the therapist and maximum freedom for the patient is oft times the end sought by both the psychiatric profession and the law." *Id.*, citing *O'Connor v. Donaldson* (1975), 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396. In *O'Connor*, the high court held that a state cannot constitutionally confine, without more, a nondangerous mentally ill individual who can live safely in freedom. *O'Connor* is clearly inapplicable to the dangerous individual. The Supreme Court spoke in terms of "locking a person up," "simple custodial confinement," and "fenc[ing] in the harmless mentally ill." *Id.*, 422 U.S. at 575, 95 S.Ct. at 2493-2494, 45 L.Ed.2d at 407. By relying on *O'Connor*, the court in *Hasenei* apparently felt that the level of control needed to satisfy Section 315 is that of actual constraint or confinement. More directly, the court in *Santa Cruz,* 590 So.2d at 445, reasoned that "[t]his case does not meet section 319 standards. [The patient] was not in Northwest Dade's custody." The remaining cases do not directly address the issue other than to conclude, without explanation, that the ability to control is lacking in the outpatient setting.

that there will be diverse levels of control which give rise to corresponding degrees of responsibility.

{¶ 52} The argument could be made that the two Illustrations to Section 319 describe situations where the potentially harmful individual is confined and then negligently released. However, the rule stated in Section 319 is noticeably broader. Just as there are diverse levels of control, there are different levels of taking "charge." In contrast to the "takes charge" language of Section 319, Section 320 sets forth the duty of one who "takes the custody" of another under certain conditions to control the conduct of third persons as to prevent them from harming the other. The comments to Section 320 indicate that the term "custody," as used in Section 320, is more suggestive of restrictions on liberty. Thus, "the illustrations appended to [Section 319], which are drawn in the context of a private hospital or sanitarium for the insane, are obviously not by way of limitation." *McIntosh,* 168 N.J.Super. at 483, 403 A.2d at 509, fn. 11.

{¶ 53} Although the outpatient setting affords the psychotherapist a lesser degree of control over the patient than does the hospital setting, it nevertheless embodies sufficient elements of control to warrant a corresponding duty to control. As we noted *supra*, there are a number of anticipatory measures that could be taken in the outpatient setting to prevent the patient's violent propensities from coming to fruition. To find that such measures lack the quality of control would require us to feign ignorance of the facts and testimony in the case *sub judice*.

{¶ 54} Dr. Brown testified that neuroleptic medication controls symptoms of schizophrenia in approximately seventy percent of schizophrenics. Lambert acknowledged that the symptoms of schizophrenia can be controlled with antipsychotic medication such as Navane, and that one of the possible risks associated with taking a medication-controlled schizophrenic off his medication is that he can become dangerous to himself or others. Until Dr. Brown weaned Matt off his medication, Matt was a medication-controlled and treatment-compliant patient. Drs. Goff and Tanay were both of the opinion that Matt would have remained compliant with his treatment and medication had Dr. Brown not weaned him off the Navane, and that had Matt remained on medication, he would not have had the overt psychotic symptoms that led him to kill his parents and injure his sister.

{¶ 55} In addition, Drs. Goff and Tanay testified that at various points in time after October 11, 1990, the last time Dr. Brown saw Matt, a number of other steps could have been taken by Dr. Brown, FFCC and its employees to prevent Matt's dangerous proclivities from manifesting. According to their testimony, Dr. Brown should have closely monitored Matt's condition for at least six months after

withdrawing his medication. If this had been done, Dr. Brown could have reinstated Matt's medication upon the reappearance of symptoms. Since this was not accomplished, Matt's condition eventually deteriorated to the point of noncompliance while under the care of FFCC. At this point, Drs. Goff and Tanay opined, FFCC should have taken aggressive action to persuade Matt to continue treatment and have his medication reinstated by Dr. Brown. Such action should have included, among other things, strong family involvement, making Matt's participation in vocational therapy contingent upon continued treatment, and telling Matt that he faced involuntary hospitalization unless he resumed taking his medication. If such measures had proved to be ineffective, and Matt nevertheless continued to deteriorate as he did, he would need to be involuntarily hospitalized, which, Drs. Goff and Tanay opined, should have taken place in May or June 1991.

{¶ 56} Thus, we conclude that the psychotherapist-outpatient relationship embodies sufficient elements of control to warrant a corresponding duty to control.[5]

C

{¶ 57} Society has a strong interest in protecting itself from those mentally ill patients who pose a substantial risk of harm. See R.C. 5122.01(B). See, also, *Tarasoff,* 17 Cal.3d at 440, 442, 131 Cal.Rptr. at 26, 27, 551 P.2d at 346, 347-348. To this end, society looks to the mental health profession to play a significant role in identifying and containing such risks. See, generally, R.C. Chapter 5122. The mental health community, therefore, has a broadly based responsibility to protect the community against danger associated with mental illness. See, *e.g.*, *Lipari,* 497 F.Supp. at 190; *McIntosh,* 168 N.J.Super. at 489, 403 A.2d at 512. This responsibility is analogous to the obligation a physician has to warn others of his patient's infectious or contagious disease.

{¶ 58} In *Jones v. Stanko* (1928), 118 Ohio St. 147, 160 N.E. 456, at paragraphs one and two of the syllabus, the court held that a physician not only has the statutory duty to report his patient's contagious disease to the appropriate governmental agency, but also the duty "to exercise ordinary care in giving notice of the existence of such contagious disease to other persons who are known by the

---

5. This does not mean, however, that the psychotherapist has a duty to control the violent propensities of the outpatient merely because he has the ability to control. If the ability to control automatically gave rise to a corresponding duty to control, the general rule of nonliability for nonfeasance would be undermined. The ability to control is a necessary but not a sufficient basis for finding a special relation. As explained in 2 Restatement of Torts, *supra*, at 123, Section 315, Comment *b*:

"In the absence of either one of the kinds of special relations described in this Section, the actor is not subject to liability if he fails, either intentionally or through inadvertence, to exercise his ability so to control the actions of third persons as to protect another from even the most serious harm. This is true although the actor realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself."

physician to be in dangerous proximity to such patient." *Jones* is important for four reasons. First, it demonstrates that Ohio common law recognizes that a physician can have a duty to others with whom he has no professional relationship. Second, it accepts that a duty can arise by virtue of the public interest in containing certain risks. Third, it places a duty upon the physician to act affirmatively to protect others from a danger not only of which he is aware, but also of which he should be aware. Fourth, the duty owed by the physician to diagnose and treat his patient's condition for the benefit of others is the same duty already owing to the patient.

{¶ 59} As explained in *McIntosh,* 168 N.J.Super. at 490, 403 A.2d at 512, a patient's dangerous propensities "may affect [others] in much the same sense as a disease may be communicable. The obligation imposed by this court, therefore, is similar to that already borne by the medical profession in another context."

D

{¶ 60} In *Littleton, supra*, 39 Ohio St.3d at 97, 529 N.E.2d at 459, we recognized the difficulty inherent in forecasting whether a particular patient may pose a danger to others. Such difficulty, however, does not justify a blanket denial of recovery. The concept of due care adequately accounts for the difficulty of rendering a definitive diagnosis of a patient's propensity for violence. The psychotherapist is not expected to render a perfect prediction of future violence. All that is required is that he or she arrive at an informed assessment of the patient's propensity for violence. *Littleton,* 39 Ohio St.3d at 98-99, 529 N.E.2d at 460; *Perreira,* 768 P.2d at 1216-1217; *Schuster,* 144 Wis.2d at 246, 424 N.W.2d at 168-169; *Lipari,* 497 F.Supp. at 192; *McIntosh,* 168 N.J.Super. at 483, 403 A.2d at 508; *Tarasoff,* 17 Cal.3d at 438, 131 Cal.Rptr. at 25, 551 P.2d at 345. Moreover, to hold that assessments of dangerousness are so plagued by uncertainty as to be without value would raise serious questions as to the entire present basis for civil commitment.[6] See R.C. 5122.01(B)(2). See, also, *Perreira,* 768 P.2d at 1217; *Schuster,* 144 Wis.2d at 247-248, 424 N.W.2d at 169; *McIntosh,* 168 N.J.Super. at 494-495, 403 A.2d at 514.

---

6. In response to the question whether he disagreed that " '[d]etermining future dangerousness is a task at which no profession has yet been demonstrated to be successful and for which psychiatrists probably have no special skills,' " Dr. Tanay responded: "I think psychiatrists are capable of determining that someone has a high potential for being dangerous. If not, then I think we have wasted billions of dollars in employing psychiatrists in evaluating people before we commit them and before we hospitalize them."

It is also worthy of comment that the mental health profession claims expertise in predicting the stability and responsibility of prospective employees. See, generally, Rouse & Butcher, Annotated Bibliography on the Use of the MMPI/MMPI-2 in Personnel and Educational Selection (1995); Applying Psychology in Business: The Handbook for Managers and Human Resource Professionals (1990) 835, Chapter 83. It would be somewhat inconsistent to claim the ability to predict likely human behavior in the employment setting, based solely on a single test and/or interview, yet claim that a psychotherapist is without ability to predict dangerous propensities in the outpatient setting.

E

{¶ 61} One goal of modern psychiatry is to place patients in the least restrictive environment. See, *e.g.*, *Perreira,* 768 P.2d at 1219. The patient has a right to be free of unnecessary confinement. *Littleton,* 39 Ohio St.3d at 97, 529 N.E.2d at 459. Mental hospitals are not dumping grounds for all persons whose behavior might prove to be inconvenient or offensive to society. In *O'Connor v. Donaldson* (1975), 422 U.S. 563, 575, 95 S.Ct. 2486, 2494, 45 L.Ed.2d 396, 407, the United States Supreme Court put it this way:

"May the State fence in the harmless mentally ill solely to save its citizens from exposure to those whose ways are different? One might as well ask if the State, to avoid public unease, could incarcerate all who are physically unattractive or socially eccentric. Mere public intolerance or animosity cannot constitutionally justify the deprivation of a person's physical liberty."

{¶ 62} These are important interests, not to be lightly infringed upon. Accordingly, there is some trepidation concerning the imposition of a duty because of the fear that therapists will attempt to protect themselves from liability by involuntarily hospitalizing nonviolent mental patients. See *Littleton,* 39 Ohio St.3d at 97-98, 529 N.E.2d at 459, fn. 18.

{¶ 63} This fear, however, has no reliable statistical support. See *Perreira,* 768 P.2d at 1219; *McIntosh,* 168 N.J.Super at 496, 403 A.2d at 515. Instead, the statistical evidence that is available indicates that "*Tarasoff* has not discouraged therapists from treating dangerous patients, nor has it led to an increased use of involuntary commitment of patients perceived as dangerous." Givelber, Bowers & Blitch, *Tarasoff*, Myth and Reality: An Empirical Study of Private Law in Action, 1984 Wis.L.Rev. 443, 486.

{¶ 64} Moreover, as the court explained in *Lipari,* 497 F.Supp. at 192-193:

"This argument misinterprets the nature of the duty imposed upon the therapist. The recognition of this duty does not make the psychotherapist liable for any harm caused by his patient, but rather makes him liable only when his negligent treatment of the patient caused the injury in question. * * *

"Thus, * * * a psychotherapist is not subject to liability for placing his patient in a less restrictive environment, so long as he uses due care in assessing the risks of such a placement. This duty is no greater than the duty already owing to the patient." See, also, *Perreira, supra*, 768 P.2d at 1219.

F

{¶ 65} As to the importance of safeguarding the confidentiality of psychotherapeutic communications, this interest comes into play primarily when the psychotherapist is required to warn a potential victim of a patient's propensity

for violence. However, as we noted in *Littleton,* 39 Ohio St.3d at 98, 529 N.E.2d at 459, fn. 19, "an exception [to confidentiality] exists for disclosures necessary to protect individual or public welfare. See *Jones v. Stanko* (1928), 118 Ohio St. 147, 160 N.E. 456, paragraph two of the syllabus; see, generally, Johnston [Breach of Medical Confidence in Ohio (1986), 19 Akron L.Rev. 373]."

{¶ 66} "The American Medical Association has long allowed breaches of confidence when 'it becomes necessary in order to protect the welfare of the individual or of the community.' Principles of Medical Ethics of the American Medical Association (1957), Section 9. Apparently, even before the seminal *Tarasoff* decision, therapists occasionally gave warnings to potential victims and their families. Wise, Where the Public Peril Begins: A Survey of Psychotherapists to Determine the Effects of *Tarasoff* (1978), 31 Stan.L.Rev. 165, 183-184, 190." See, also, Paquin, Confidentiality and Privilege: The Status of Social Workers in Ohio (1992), 19 Ohio N.U.L.Rev. 199, 241-243; Givelber, Bowers & Blitch, *supra,* 1984 Wis.L.Rev. at 468-472.

G

{¶ 67} R.C. 5122.34 provides that:

"Persons, including, but not limited to, boards of alcohol, drug addiction, and mental health services and community mental health agencies, acting in good faith, either upon actual knowledge or information thought by them to be reliable, who procedurally or physically assist in the hospitalization or discharge, *determination of appropriate placement*, or in judicial proceedings of a person under this chapter, do not come within any criminal provisions, and are free from any liability to the person hospitalized or to any other person. *No person shall be liable for any harm that results to any other person as a result of failing to disclose any confidential information about a mental health client, or failing to otherwise attempt to protect such other person from harm by such client.* This section applies to expert witnesses who testify at hearings under this chapter." (Emphasis added.)

{¶ 68} The emphasized language represents the relevant changes made by the General Assembly under Am.Sub.S.B. No. 156. 142 Ohio Laws, Part I, 838. Am.Sub.S.B. No. 156 was passed on March 17, 1988, and was generally effective on March 28, 1988, the date it was approved by the Governor. *Id.* at 852-853. However, R.C. 5122.34 as amended by that bill became effective on July 1, 1989. *Id.* at 848. Thus, at the time we decided *Littleton, supra,* amended R.C. 5122.34 had already passed, but was not yet effective. See *id.*, 39 Ohio St.3d at 95, 529 N.E.2d at 457, fn. 8.

{¶ 69} FFCC argues that, pursuant to the first sentence of R.C. 5122.34, its decision with respect to whether Matt should have been hospitalized against his

will is immunized to the extent it was rendered in good faith. In this regard, FFCC contends that the first sentence of R.C. 5122.34 operates not only to provide limited immunity for decisions *to* hospitalize a mental patient, but also for decisions *not to* hospitalize.

{¶ 70} Although FFCC makes no argument with respect to the second sentence of R.C. 5122.34 added by Am.Sub.S.B. No. 156, two legal writers have suggested that this additional language purports to preclude *Tarasoff*-type liability. Eagle & Kirkman, Baldwin's Ohio Mental Health Law (2 Ed.1990) 127-129, Section T 3.04; Hulteng, The Duty to Warn or Hospitalize: The New Scope of *Tarasoff* Liability in Michigan (1989), 67 U. of Det.L.Rev. 1, 11. We consider these issues together because they suffer from the same general flaw of attempting to extend R.C. 5122.34 beyond the boundaries set by the General Assembly.

{¶ 71} R.C. 5122.34 does not apply to immunize mental health professionals from liability in all contexts. It operates only in the area of civil commitment. It applies to mental health professionals "who procedurally or physically assist in the hospitalization or discharge, determination of appropriate placement, or in judicial proceedings of a person under this chapter." The decision not to initiate commitment procedures is a decision not to become involved in proceedings under R.C. Chapter 5122, thus taking the psychotherapist outside the protection of R.C. 5122.34. Accordingly, when FFCC itself determined that Matt was not committable, it decided not to "assist" in proceedings "under this chapter."

{¶ 72} Similarly, in granting unqualified immunity to mental health professionals for failing to warn or otherwise protect others from harm caused by their client, the second sentence of R.C. 5122.34 presupposes that affirmative action was taken under R.C. Chapter 5122. In other words, the General Assembly has made a policy decision that those who assist in hospitalizing, placing or discharging a person under R.C. Chapter 5122 are not liable for failure to warn or protect. Thus, a mental health professional who has not assisted in having a mental patient committed, placed, or discharged under R.C. Chapter 5122 is not entitled to the immunity bestowed by R.C. 5122.34.

{¶ 73} Accordingly, FFCC is not entitled to qualified immunity under the first sentence of R.C. 5122.34 although, as set forth *infra*, it is entitled to what amounts to the same thing under the "psychotherapist judgment rule." More important, the second sentence of R.C. 5122.34 does not preclude the finding that a special relation exists between the psychotherapist and the outpatient which imposes a common-law duty on the therapist to take affirmative steps to control the patient's violent conduct.

H

{¶ 74} We conclude that the relationship between the psychotherapist and the patient in the outpatient setting constitutes a special relation justifying the imposition of a duty upon the psychotherapist to protect against and/or control the patient's violent propensities. The outpatient setting embodies sufficient elements of control to warrant the imposition of such a duty, and such a duty would serve the public's interest in protection from the violently inclined mental patient in a manner that is consistent with Ohio law. On the other hand, the imposition of such a duty would not impose undue burdens upon the therapist or result in overcommitment, nor would it significantly affect the confidential character of psychotherapeutic communications.

II

THE "PSYCHOTHERAPIST JUDGMENT" RULE

{¶ 75} In *Littleton,* 39 Ohio St.3d 86, 529 N.E.2d 449, we balanced the various policy considerations in determining the appropriate standard of care to be applied to psychiatric decisions releasing voluntarily hospitalized mental patients from the hospital. The court concluded that the malpractice standard of ordinary care should not be applied, but that a "professional judgment standard" should be applied similar to the "business judgment rule." Accordingly, the holding of *Littleton* describes an application of the professional judgment standard to three different situations in the voluntary hospitalization setting.

{¶ 76} We explained in part as follows:

" 'Under such a "psychotherapist judgment rule," the court would not allow liability to be imposed on therapists for simple errors in judgment. Instead, the court would examine the "good faith, independence and thoroughness" of a psychotherapist's decision not to commit a patient. * * * Factors in reviewing such good faith include the competence and training of the reviewing psychotherapists, whether the relevant documents and evidence were adequately, promptly and independently reviewed, whether the advice or opinion of another therapist was obtained, whether the evaluation was made in light of the proper legal standards for commitment, and whether other evidence of good faith exists.' (Citation omitted.)" *Id.*, 39 Ohio St.3d at 96, 529 N.E.2d at 458, quoting *Currie v. United States* (M.D.N.C.1986), 644 F.Supp. 1074, 1083, affirmed on alternative grounds, *Currie, supra*, 836 F.2d 209.

{¶ 77} Similarly, in *Tarasoff, supra*, 17 Cal.3d at 438, 131 Cal.Rptr. at 25, 551 P.2d at 345, the court explained that:

"Within the broad range of reasonable practice and treatment in which professional opinion and judgment may differ, the therapist is free to exercise his

or her own best judgment without liability; proof, aided by hindsight, that he or she judged wrongly is insufficient to establish negligence."

{¶ 78} Plaintiffs-appellants argue that the good faith judgment rule applies only to decisions on "whether hospitalization of the patient is required," and only in "those cases in which a standard of care cannot be determined by the expert witnesses." We disagree.

{¶ 79} The nature of the duty imposed requires the therapist to determine the interrelated questions of whether a patient poses a risk of harm to others and how to prevent such harm from coming to fruition. It does not necessarily require in all cases that the therapist hospitalize or medicate the patient, warn others, or take any single specific step to avert the danger. What is required, if anything is required, depends upon the facts and allegations of each case. Thus, when courts indiscriminately refer to the "duty to warn" or the "duty to hospitalize," they are merely describing how particular therapists, under particular circumstances, failed to fulfill their overall duty. We reject the notion that divergent standards of care should be applied to what is essentially a single duty.

{¶ 80} The psychotherapist judgment rule is a compromise between "declining to recognize a duty at all, or recognizing a duty and liability under a traditional negligence theory." *Currie,* 644 F.Supp. at 1083. The overriding concern is to protect the public from assault by the violent mentally ill. Fundamentally, the duty is imposed because the therapist is the best, if not the only, line of defense society has against the danger posed by the violent mental patient. Because of their special training, skill and contact with the patient, psychotherapists are especially equipped to thwart the danger.

{¶ 81} However, the public interest would not be served by a standard of care which intrudes upon the integrity of the psychotherapeutic relationship. To maintain its efficacy, the psychotherapeutic relationship must instill confidence in the patient and afford a certain degree of autonomy for the therapist in rendering decisions. Although the concerns over predictability, overcommitment, and confidentiality are overstated, they appear nevertheless to cause some trepidation on the part of the patient and therapist alike which can affect the viability of the relationship. See, generally, Givelber, Bowers & Blitch, *supra*, 1984 Wis.L.Rev. 443; Stone, The *Tarasoff* Decisions: Suing Psychotherapists to Safeguard Society, *supra*, 90 Harv.L.Rev. 358. Society's interest in being free from harm caused by mentally ill persons is, in the final analysis, dependent upon "[t]he patient's right to good medical care." *Littleton,* 39 Ohio St.3d at 97, 529 N.E.2d at 459. Without good medical care, society would stand unprotected from mental patients with violent propensities.

{¶ 82} Thus, the professional judgment rule adopted in *Littleton* seeks to strike an appropriate balance by not allowing the psychotherapist to act in careless disregard of the harm presented to others by violently inclined patients, yet preserving the confidence, autonomy, and flexibility necessary to the psychotherapeutic relationship. There is nothing in the analysis itself that would suggest a different result in the outpatient setting.

{¶ 83} Accordingly, we hold that when a psychotherapist knows or should know that his or her outpatient represents a substantial risk of harm to others, the therapist is under a duty to exercise his or her best professional judgment to prevent such harm from occurring.[7]

### III

### THE "SPECIFIC THREATS TO SPECIFIC VICTIMS" RULE

{¶ 84} Dr. Brown urges the court to adopt the "specific threats to specific victims" rule articulated in *Brady,* 751 F.2d at 331, and *Thompson v. Alameda Cty.* (1980), 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728. Under this rule, "absent allegations in a complaint that a psychiatrist is aware of his patient's specific threats to specific victims, there exists no legal duty or obligation on the part of the psychiatrist for harm done by the patient." *Brady,* 751 F.2d at 331.

{¶ 85} The rule, at least as articulated in *Brady*, encompasses three elements as a precondition to liability: (A) that the therapist is actually aware that the patient represents a threat of harm to others, (B) that the threat of harm be specific, and (C) that the target of such threats be precisely and specifically identified. Although these elements tend to overlap and meld together in application, for purposes of analysis we will consider them separately.

### A

### Awareness

{¶ 86} In Ohio, a cause of action for professional negligence is not dependent upon actual awareness of the potential for harm. Instead, the duty to protect others is imposed when the medical professional knows *or should know* that

---

7. In applying this standard, courts should not lose sight of the nature of the duty imposed. The psychotherapist is not necessarily free of liability merely because he or she considered one of several alternatives. What the psychotherapist judgment rule requires is that the therapist consider all alternatives. Otherwise, an evaluation can hardly be considered thorough. For example, where a therapist knows or should know that his or her patient poses a substantial risk of harm to others and decides not to hospitalize the patient, the therapist can still be found liable for failing to explore other options such as medicating the patient or warning potential victims. See *Littleton,* 39 Ohio St.3d at 102, 529 N.E.2d at 462-463 (Douglas, J., concurring in part and dissenting in part). Similarly, a decision is not necessarily based on professional judgment where the psychotherapist is aware or should be aware that the course of action decided upon would be ineffective, *e.g.,* if medication is prescribed but the patient is not compliant, other alternatives may have to be considered. Also, it may become necessary to reevaluate a chosen course of treatment where signs of decompensation become evident. On the other hand, if the therapist, in good faith, chooses an alternative after thoroughly considering all the options, he or she will not be held liable merely because, in hindsight, the choice proved to be wrong.

the patient is likely to cause harm to others. See *Littleton,* 39 Ohio St.3d at 92, 529 N.E.2d at 455; *Jones, supra*, 118 Ohio St. at 153, 160 N.E. at 458. Moreover, as the court in *Bardoni,* 151 Mich.App. at 180, 390 N.W.2d at 223-224, aptly explained:

{¶ 87} "[I]f a duty to take reasonable steps to protect a third person is limited only to those victims which are actually known to the psychiatrist, * * * an extremely negligent psychiatrist may not ascertain that the patient is even dangerous or that the patient is dangerous to anyone in particular. For example: a psychiatric hospital's records of a patient indicate that the patient has violently focused his aggression on a named or particular person, * * * but the treating psychiatrist fails to read the records and is not apprised of this fact. Thus the target of the violence is identified or readily identifiable, but the defendant psychiatrist is not even aware that there exists a particular target of his patient's aggression. The relevant determination then becomes whether the psychiatrist should have ascertained, by acting in accordance with the standards of his profession, *e.g.*, by reading the hospital records, that there existed a target of his patient's aggression and the identity of the target. Thus, whether the treating psychiatrist actually knows of a target and whether that target is actually identified or readily identifiable by the psychiatrist is not always the appropriate focus in determining the extent of a psychiatrist's duty to persons endangered by his patient." (Citations omitted.)

B

Specific Threats

{¶ 88} R.C. 5122.01 provides as follows:

"(B) 'Mentally ill person subject to hospitalization by court order' means a mentally ill person who, because of his illness:

"* * *

"(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness."

{¶ 89} Thus, in Ohio evidence of specific threats is not necessarily required in order to hospitalize a mentally ill patient against his will. A mentally ill patient is also subject to involuntary commitment when his dangerous proclivities are found to be imminent by virtue of "evidence of * * * other violent behavior * * * or other evidence of present dangerousness." It would indeed be curious to apply a stricter standard as a precondition to the psychotherapist's common-law duty to control, especially since that duty, in its most confining aspect, would require the therapist to institute those very commitment proceedings. Moreover, there are

obviously circumstances where, despite the lack of a specific threat, it can nevertheless be ascertained that the patient presents a danger to others and who the likely victims will be. See *Hamman, supra*, 161 Ariz. at 64, 775 P.2d at 1128; *Jablonski, supra*, 712 F.2d at 398. "Society must not become the victim of a dangerous patient's ambiguity." *Schuster, supra*, 144 Wis.2d at 256, 424 N.W.2d at 172-173.

C

Specifically Targeted Victims

{¶ 90} The advent of *Thompson* and *Brady* has compelled courts to confront the question of whether and when the "readily identifiable victim" rule is applicable and, if applicable, what degree of specificity is needed. The parties in the case *sub judice* tend to categorize the various cases which have addressed this issue according to whether they adopt the readily identifiable victim rule or reject it in favor of a more encompassing standard of foreseeability. Having drawn this line of demarcation, the parties would have us choose between what they perceive to be opposing options. However, we find the query as to which is the better option to be a misdirected question in this case. The views seen by the parties as being divergent are for the most part separate standards applied in different contexts.

{¶ 91} The "readily identifiable victim" rule has its genesis in *Thompson*, where it was applied only to allegations concerning the failure to warn, as the allegations concerning the defendants' failure to otherwise control the patient's violent conduct were disposed of on other grounds. The court in *Thompson* summarized its holding by explaining that "[w]ithin this context and for policy reasons the duty to warn depends upon and arises from the existence of a prior threat to a specific identifiable victim." *Id.*, 27 Cal.3d at 758, 167 Cal.Rptr. at 80, 614 P.2d at 738. The court reasoned that requiring warnings to the public at large would be "unwieldy and of little practical value," producing "a cacophony of warnings that by reason of their sheer volume would add little to the effective protection of the public." *Id.*, 27 Cal.3d at 754-755, 167 Cal.Rptr. at 77, 614 P.2d at 735.

{¶ 92} After *Thompson*, cases that have limited the duty of care to identifiable victims have focused on the failure to warn. Within this context, they have also restricted the application of the rule, allowing a psychotherapist to be held liable to others in close relationship or close proximity to the victim, or finding that certain circumstances fall between the extremes of requiring warnings to be issued to the public at large and limiting it to a specifically named victim. On the other hand, cases that have rejected the rule have focused on a myriad of other alternative precautions alleged to have been reasonably necessary to control the patient. These

cases vary in the standards of foreseeability that they impose, ranging from limiting the scope of the duty to those within the "zone of danger" to expanding it to cover the general public or all the world.

{¶ 93} At first blush, the cases may lead one to believe that a choice must be made between adopting or rejecting the readily identifiable victim rule across the board. This is because many of the cases involve allegations concerning the psychotherapist's failure to take a number of steps to control the patient or protect the potential victim in addition to the giving of warnings. Upon closer scrutiny, however, it becomes apparent that the "readily identifiable victim" rule is applied only in the context of failure to warn. On the other hand, when the propriety of other steps alleged to have been required are examined, the focus shifts away from the special policy considerations and practical difficulties which have been said to justify limiting the scope of the duty in failure-to-warn cases. Thus, the "readily identifiable victim" rule is born, lives, and grows in failure-to-warn cases. *Wofford,* 795 P.2d at 520; *Hamman,* 161 Ariz. at 64, 775 P.2d at 1128; *Perreira,* 768 P.2d at 1210; *Bardoni,* 151 Mich.App. at 180, 390 N.W.2d at 223-224; *Neakok,* 721 P.2d at 1128-1129, 1131-1132; *Petersen,* 100 Wash.2d at 428, 671 P.2d at 237; *Hedlund v. Orange Cty. Superior Court* (1983), 34 Cal.3d 695, 705, 194 Cal.Rptr. 805, 810, 669 P.2d 41, 46-47; *Jablonski,* 712 F.2d at 398; *Lipari,* 497 F.Supp. at 194-195; *Bradley Ctr., Inc.,* 250 Ga. at 200-202, 296 S.E.2d at 695-696. See, also, *Reisner v. Regents of the Univ. of California* (1995), 31 Cal.App.4th 1195, 1199-1200, 37 Cal.Rptr.2d 518, 520-521.

{¶ 94} The appropriate question, therefore, is not which approach should be chosen, but whether it is wise to extend the readily identifiable victim rule beyond the failure-to-warn case. In considering this issue, we find ourselves in agreement with the following well-reasoned analysis of *Currie, supra*, 644 F.Supp. at 1079-1080:

"One cannot read *Thompson* without being struck by the emphasis the court placed on the *practical* difficulties which the lack of a 'readily identifiable' victim placed on a duty to warn. Without knowing specifically who the victim would be, the therapist could not know who to warn. The court discussed the possibility of a general warning, but noted that the effectiveness of such a warning would be greatly reduced because people would pay less attention to them. 27 Cal.3d at 753-760, 167 Cal.Rptr. at 77-80, 614 P.2d at 735-738. In sum, the court found that, unlike in *Tarasoff, Thompson*'s reduced benefits of *general* warnings would not outweigh the problems such as breach of patient confidentiality, now worsened by broader dissemination of his threats.

"This conclusion cannot be reached in a 'duty to commit' balancing test. Unlike a duty to warn case, in which the therapist needs to know the identity of the victim in order to adequately act, the therapist in a duty to commit case need only know that the patient is dangerous generally in order to adequately commit him. As a practical matter, the victim's identity is irrelevant to whether the doctor can adequately act—by committing the patient, the therapist is able to protect all possible victims.

"The court does not believe that it is wise to limit any duty to commit according to the victim. Arguably, the patient who will kill wildly (rather than specifically identifiable victims) is the one *most* in need of confinement. In negligent release cases, a defendant's duty generally has not been limited to readily identifiable victims, and the court believes a similar rule is appropriate here. Citizens outside of the 'readily identifiable' sphere but still within the 'foreseeable zone of danger' are potential victims a therapist should consider if he has a duty to them and a means of adequately protecting them." (Citations and footnote omitted; emphasis *sic*.) See, also, *Schuster,* 144 Wis.2d at 256-259, 424 N.W.2d at 172-174.

{¶ 95} We need not determine at this time whether and to what extent the readily identifiable victim rule should attach in a failure-to-warn case. The case *sub judice* does not involve any allegation that Dr. Brown or FFCC was negligent in failing to warn Matt's family. The policy considerations and practical difficulties leading to a limitation on the duty in failure-to-warn cases are not present here. Accordingly, we reject such a limitation in this case. " 'It is not necessary that the defendant should have anticipated the particular injury. It is sufficient that his act is likely to result in an injury to someone.' " *Di Gildo v. Caponi* (1969), 18 Ohio St.2d 125, 130, 47 O.O.2d 282, 285, 247 N.E.2d 732, 736, quoting *Neff Lumber Co. v. First Natl. Bank* (1930), 122 Ohio St. 302, 171 N.E. 327, 330.

IV

REMOTENESS

{¶ 96} Dr. Brown also argues that he owed no duty to plaintiffs-appellants as a matter of law because the shootings took place over nine months after the last time he treated Matt. Thus, he contends, it cannot be found that the necessary element of control was present during those nine months, especially since FFCC took over Matt's care.

{¶ 97} This argument commingles two distinct issues, that of duty and proximate cause. The control portion of the argument goes to the issue of duty. In this regard, the argument may be reduced to a proposition that there can be no duty unless the patient was under the care of the therapist at the time the harm was inflicted. Dr. Brown cites no authority for this position. Moreover, such a

proposition runs counter to negligence principles. Viewing the facts most favorably to plaintiffs-appellants, Civ.R. 56(C), the gravamen of Dr. Brown's alleged negligence in this case is the very act of withdrawing medication and relinquishing care of Matt. It is clearly unsound to absolve a negligent defendant because of the very act which made his conduct negligent.

{¶ 98} The issue of remoteness in time—a question of proximate cause—cannot be resolved as a matter of law. As Prosser & Keeton explains:

"Remoteness in time or space may give rise to the likelihood that other intervening causes have taken over the responsibility. But when causation is found, and other factors are eliminated, it is not easy to discover any merit whatever in the contention that such physical remoteness should of itself bar recovery. The defendant who sets a bomb which explodes ten years later, or mails a box of poisoned chocolates from California to Delaware, has caused the result, and should obviously bear the consequences." (Footnotes omitted.) Prosser & Keeton on Torts, *supra*, at 283, Section 43.

{¶ 99} Thus, no fixed rule can be established as to how quickly the harm must occur in order to hold the defendant liable. Some courts have found periods ranging between three and a half months to two years and five months to be too remote, while other courts have found periods ranging from five and one-half months to three years not to be too remote. *Reisner,* 31 Cal.App.4th at 1201, 37 Cal.Rptr.2d at 521 (three years not too remote); *Wofford,* 795 P.2d at 521 (two years and five months too remote. Also, notes that a lapse of time of three and one-half months has been found too remote); *Wagshall,* 148 A.D.2d at 446, 538 N.Y.S.2d at 598 (seven to eight months too remote); *Naidu,* 539 A.2d at 1075 (five and one-half months not too remote); *Neakok,* 721 P.2d at 1123, 1135-1136 (six months not too remote); *Lundgren,* 354 N.W.2d at 28-29 (one and one-half years not too remote).

{¶ 100} Physical or temporal remoteness, therefore, may be an important consideration in whether negligent conduct is a substantial factor in producing harm; but the mere lapse of time, in the absence of intervening causes, is not of itself sufficient to prevent the defendant's negligence from being the legal cause, regardless of how much time has passed. *Naidu, supra*, 539 A.2d at 1075; Restatement of Torts, *supra*, at 434, Section 433, Comment *f*; 2 American Jurisprudence, Proof of Facts 3d, *supra*, at 344, Section 4.

{¶ 101} In light of the testimony of Drs. Goff and Tanay that part of Dr. Brown's negligence lay in the relinquishment of Matt's care to FFCC and that Dr. Brown's negligence did contribute to the events of July 25, 1991, it cannot be found as a matter of law that FFCC's actions constitute an intervening cause.

Accordingly, there remains a genuine issue of material fact as to whether Dr. Brown's alleged negligence in treating Matt was a substantial factor in producing the injuries and deaths occurring on July 25, 1991.

V

APPLICATION OF STANDARD OF CARE TO FACTS

{¶ 102} Viewing the evidence most favorably to plaintiffs-appellants, we find that reasonable minds could conclude that Dr. Brown failed to exercise his best professional judgment in diagnosing and controlling Matt's propensity for violence. When Dr. Brown first saw Matt on July 19, 1990, he noted that Matt was "recently discharged from a mental health unit of some sort in Philadelphia, Pennsylvania, on Elavil and Navane," and sought to obtain the C.A.T.C.H. records which he received sometime prior to Matt's next scheduled appointment on August 16, 1990. According to Drs. Goff and Tanay, those records revealed that Matt was a medication-controlled schizophrenic who, without medication, would more likely than not have a relapse of his psychosis, placing him at substantial risk for conflict with his parents and potential violence.

{¶ 103} However, instead of reading the C.A.T.C.H. records or contacting Dr. Ladenheim, Dr. Brown noted on October 11, 1990, the date of his last appointment with Matt, that he had "no further insight as to just what happened to get him [Matt] into the mental hospital in Philadelphia or why they may have prescribed neuroleptic [medication] for him." Thus, he diagnosed Matt in part as a malingerer intent on gaining Social Security disability benefits, and weaned him off his medication.

{¶ 104} In *Littleton, supra*, 39 Ohio St.3d at 96, 529 N.E.2d at 458, we relied in part upon *Bell v. New York City Health & Hospitals Corp.* (1982), 90 A.D.2d 270, 456 N.Y.S.2d 787, in constructing the professional judgment standard to be applied in the hospital setting. In *Bell*, the court explained that:

"A decision that is without proper medical foundation, that is, one which is not the product of a careful examination, is not to be legally insulated as a professional medical judgment. Stated otherwise, '[p]hysicians are not liable for mistakes in professional judgment, provided that they do what they think best *after careful examination*. * * * However, liability can ensue if their judgment *is not based upon intelligence* and thus there is a failure to exercise any professional judgment.'" (Citations omitted and emphasis *sic*.) *Id.*, 90 A.D.2d at 280-281, 456 N.Y.S.2d at 794.

{¶ 105} Applying the standard to the facts of the case, the court in *Bell* concluded that:

"Dr. Hermann [did not] make any attempt to ascertain from the Veteran's Administration Hospital, the patient's medical history and treatment, even though he noted that Bell 'refuse[d] to discuss his past psychiatric history.' Suicidal ideations or tendencies may well have gone undetected as a result of inadequate examination." 90 A.D.2d at 284, 456 N.Y.S.2d at 796.

{¶ 106} Similarly, the failure to review prior medical records has played a prominent part in a number of cases holding that the psychotherapist breached his duty to others to diagnose and control the patient's violent propensities. *Hamman,* 161 Ariz. at 59, 775 P.2d at 1123; *Naidu,* 539 A.2d at 1069, 1073; *Peck,* 146 Vt. at 66, 499 A.2d at 426; *Jablonski,* 712 F.2d at 393, 394, 398. See, also, *Bardoni,* 151 Mich.App. at 180, 390 N.W.2d at 224.

{¶ 107} Accordingly, we find that reasonable jurors could conclude that Dr. Brown's failure to review the C.A.T.C.H. records or contact Dr. Ladenheim to obtain a thorough and accurate history on Matt amounted to something less than the exercise of professional judgment. Thus, summary judgment was entered improperly in favor of Dr. Brown, and the decision of the court of appeals is affirmed as to this issue.

{¶ 108} We find further that summary judgment in favor of FFCC was inappropriate for several reasons. First, the testimony of Drs. Goff and Tanay, if believed, reveals that FFCC and its employees conducted a meaningless evaluation into whether Matt was subject to involuntary hospitalization in May or July 1991. Dr. Goff testified that Matt was committable by June 14, 1991, and "that a vocational therapist has no business making decisions about what is appropriate and what's not appropriate in terms of involuntary hospitalization." Dr. Tanay testified that Matt was likely committable in May 1991, and that Lambert and Reid "had no business doing what they were doing. And [FFCC] had no business assigning them that role. * * * This was a responsibility absolutely beyond their competence." Instead, he opined, at least one psychiatrist or psychologist well-trained in the area of dealing with psychotic individuals is required for a meaningful evaluation of whether a patient is subject to involuntary hospitalization.

{¶ 109} This also is the type of situation which *Littleton* contemplates as indicating the absence of professional medical judgment. In *Littleton*, we placed reliance in part on *Cohen v. New York* (1976), 51 A.D.2d 494, 382 N.Y.S.2d 128, affirmed (1977), 41 N.Y.2d 1086, 396 N.Y.S.2d 363, 364 N.E.2d 1134, in constructing the psychotherapist judgment rule. *Id.*, 39 Ohio St.3d at 96, 529 N.E.2d at 458. In *Cohen*, the court found the absence of professional medical judgment where the patient, a schizophrenic who committed suicide on the date he

was let out of the psychiatric ward, had not been evaluated by a qualified psychiatrist. The court explained as follows:

"The determinative factual issue is whether or not a qualified psychiatrist was actively supervising the care of the decedent. * * *

"* * *

"While this record establishes that patients were discussed at team meetings, it is not established that any evaluation of this decedent's suicide propensities was made by a qualified psychiatrist during his stay at the hospital. * * *

"What happened in this case was the result of ill-defined policy, in the present circumstances, as to the power of floor nurses to impose restraints on a patient's freedom and requiring full evaluation by qualified psychiatrists at periodic intervals. The fault herein is not with Doctors Bjork, Rosenberg or Sverd as individuals, but rather with the lack of policies requiring more direct management of a patient's treatment by a qualified psychiatrist." *Id.*, 51 A.D.2d at 496-497, 382 N.Y.S.2d at 130.

{¶ 110} The second reason why summary judgment in favor of FFCC was inappropriate is that there is sufficient testimony which, if believed, establishes that FFCC was ill-equipped to deal with psychotic individuals such as Matt. Dr. Tanay testified that FFCC "was not equipped to deal with psychotics. It had neither the resources, and I would even believe not even the interest, in providing care for psychotics. * * * [Instead] psychotics were used, exploited to get funds, but they were provided virtually no meaningful care." Explaining further, Dr. Tanay stated:

"[The] combination of a psychiatrist unable to make a diagnosis of serious mental illness, and a facility staffed by non-medical personnel, was a disaster waiting to happen. * * * [W]e have here a setup, an organizational structure that cannot help but result in tragic consequences."

{¶ 111} Third, although disputed, social worker Barbara Sharp testified that FFCC had an unwritten policy that it would not initiate involuntary hospitalization proceedings, but would become involved only after such were initiated by the patient's family. The court of appeals found that "there is no evidence that this unwritten policy guided the counseling center in this case." We find, however, that there is sufficient evidence which allows for an inference that FFCC acted in accordance with such a policy.

{¶ 112} FFCC received repeated notices of Matt's deteriorating condition. It was informed of Matt's violent outbursts and of his deposit on the purchase of a gun. Mrs. Morgan specifically stated her concern that Matt may become violent, and repeatedly begged FFCC to do something before violence erupted. Instead of

taking her seriously, Lambert believed that she was exaggerating and emergency assessments were performed by what Drs. Goff and Tanay described as untrained personnel. Under these circumstances, a reasonable juror could infer that FFCC's unwritten policy guided their actions.

{¶ 113} In light of the foregoing, we find that a genuine issue of material fact remains as to whether FFCC exercised professional judgment in evaluating and treating Matt. Accordingly, we hold that summary judgment was inappropriate in favor of FFCC and its employees, and reverse the court of appeals as to this issue.

## VI

## ORDER OF "TRIFURCATION"

{¶ 114} By separate orders, the trial court "trifurcated" the issues of liability, compensatory damages and punitive damages. Plaintiffs-appellants argue that "[t]he language of Civ.R. 42(B) clearly places the burden on the moving party to demonstrate that it will suffer prejudice if a request for a separate trial is not granted."

{¶ 115} The entries by the trial court indicate that it was concerned with convenience and judicial economy. Civ.R. 42(B) allows the trial court to order separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Thus, we agree with the following conclusion made by the court of appeals:

"Although we question whether such an order serves sound judicial administration, we cannot conclude that such an order is an abuse of discretion as that term is commonly defined." See *State v. Jenkins* (1984), 15 Ohio St.3d 164, 222, 15 OBR 311, 361, 473 N.E.2d 264, 313; *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

{¶ 116} In light of all of the foregoing, we affirm the decision of the court of appeals in part, and reverse it in part, as indicated herein, and remand the cause to the trial court for further proceedings not inconsistent with this opinion.

*Judgment affirmed in part,*

*reversed in part*

*and cause remanded.*

DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

MOYER, C.J., COOK and STRATTON, JJ., dissent.

_____

**COOK, J., dissenting.**

{¶ 117} I respectfully dissent. The law recognizes the fundamental unfairness of blaming one person for the acts of another. Thus, the Restatement favors the general rule that there is no duty to act for the protection of others, with

four explicit exceptions. 2 Restatement of the Law 2d, Torts (1965), Section 315. The exceptions set forth in the Restatement are a parent's duty to control his child, a master's duty to control his servant, a land possessor's duty to control his licensees, and the duty of one who "takes charge" of another person who he knows or should know is likely to harm another to control that person. 2 Restatement of Torts, *supra*, Sections 316 to 319. The common factor among these four exceptions is that due to a "special relation" there exists the inherent *ability* or *right* to control another's conduct. *Hasenei v. United States* (D.Md.1982), 541 F.Supp. 999, 1009.

{¶ 118} It is unclear whether the majority relies on "an expansive reading" of "special relation" as used in Section 315 of the Restatement or the "take charge" analysis of Section 319 in concluding that a psychotherapist has a duty to control an outpatient. In either event, it has been noted that "the typical relationship existing between a psychiatrist and a voluntary outpatient would seem to lack sufficient elements of control necessary to bring such relationship within the rule of [Section] 315." *Hasenei v. United States, supra,* 541 F.Supp. at 1009. The only illustrations of "tak[ing] charge" set forth in the Restatement involve hospitals and sanitariums that have either permitted the escape of inpatients or negligently released contagious patients. 2 Restatement of Torts, *supra*, at 130, Section 319.

{¶ 119} In this case, Dr. Brown did not have the requisite "special relation" with Matt when Matt killed his parents and injured his sister because Dr. Brown lacked both the right and the ability to control Matt. Dr. Brown had not met with Matt for over nine months. Dr. Brown stated that he did not monitor Matt's progress after October 1990 because he relied on the fact that an experienced psychologist, a vocational rehabilitation person, and a case manager were working with Matt, "all looking for, aware of, and knowing the signs of relapse." The individuals at Fairfield Family Counseling Center ("FFCC") caring for Matt after October 1990 knew to return him to Dr. Brown upon signs of illness and did, in fact, schedule an appointment for Matt with Dr. Brown for May 23, 1991, which Matt canceled.

{¶ 120} Similarly, Dr. Brown had no ability to control Matt through medication because he could not force Matt to take his medication. When Matt first presented to Dr. Brown, he apparently had not been taking his medication regularly or in the amounts prescribed. Even during the time that Matt was meeting with Dr. Brown, Matt had independently decided to reduce his medication to only half the prescribed dosage.

{¶ 121} In reaching its decision, the majority relies on *Tarasoff v. Regents of the Univ. of California* (1976), 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334. However, *Tarasoff* did not consider the issue of whether the psychiatrist had

sufficient *ability* to control the patient but simply opined that "[s]uch a relationship may support affirmative duties for the benefit of third persons." *Id.* at 436, 131 Cal.Rptr. at 23, 551 P.2d at 343. *Tarasoff* addressed only the duty of a psychotherapist to warn and only in those situations when the patient has confided to the therapist his specific intention to kill a specific individual. In *Thompson v. Alameda Cty.* (1980), 27 Cal.3d 741, 167 Cal.Rptr. 70, 614 P.2d 728, the Supreme Court of California seemingly limited the scope of *Tarasoff* in finding that "public entities and employees have no affirmative duty to warn of the release of an inmate with a violent history who has made *nonspecific threats of harm directed at nonspecific victims*." (Emphasis *sic*.) *Id.* at 754, 167 Cal.Rptr. at 77, 614 P.2d at 735.

{¶ 122} Prior to today's decision, this court had found a special relationship between a psychotherapist and a patient in an inpatient setting where the psychiatrist had "take[n] charge" as anticipated by Section 319 of the Restatement. *Littleton v. Good Samaritan Hosp. & Health Ctr.* (1988), 39 Ohio St.3d 86, 92-93, 529 N.E.2d 449, 455. In *Littleton,* the psychiatric team had extensive contact with the inpatient and substantial opportunities to evaluate the patient's violent propensities before they discharged her.

{¶ 123} Today, this court appears to hold that, as a matter of law, any psychotherapist-patient relationship constitutes a special relation justifying the imposition of liability upon the psychotherapist for violent acts of the patient. It finds this duty even where the psychiatrist met with the patient only three times in an outpatient setting, where the patient communicated to the psychiatrist no specific threats to specific individuals, and where, upon the patient's mental health deteriorating, other mental health professionals scheduled an appointment with the psychiatrist which the patient failed to keep.

{¶ 124} If the majority has found a special relation between Dr. Brown and Matt and between FFCC and Matt under the tenuous facts of this case, are all persons employed in the psychotherapy field now strictly liable for the acts of their patients? When does a "special relation" begin in the psychotherapist-outpatient setting and when, if ever, does it terminate? Is the special relation formed during the first consultation? After three consultations? How many appointments must the outpatient cancel before the outpatient can be said to have terminated the special relation?

{¶ 125} Moreover, the majority holds that a "psychotherapist" has the duty to control a patient. Notably, R.C. 5122.10 *permits* psychiatrists and licensed clinical psychologists to involuntarily hospitalize a person believed to be mentally ill, if that person represents a substantial risk of physical harm to himself or others.

By holding that "psychotherapists" now have a duty to control an outpatient with violent propensities, the majority *mandates* that psychiatrists, psychologists, psychiatric social workers, occupational therapists, and unspecified others in the psychotherapy field commit or otherwise restrain potentially dangerous patients.

{¶ 126} In the absence of a showing of any ability or right of Dr. Brown or FFCC to control Matt in the outpatient setting, I would reinstate the trial court's order of summary judgment for Dr. Brown and FFCC. I would hold that a Section 315 special relation does not generally exist in an outpatient setting. Where, however, outpatient treatment is so intensive and controlled as to have the indicia of "tak[ing] charge" as contemplated by Section 319 of the Restatement, a "special relation" may be shown.

MOYER, C.J., and STRATTON, J., concur in the foregoing dissenting opinion.

————————————

**STRATTON, J., dissenting.**

{¶ 127} I concur with Justice Cook's dissenting opinion. However, I have additional concerns raised by the majority's murky opinion. After having read the opinion several times, I find it difficult to determine what liability this court is intending to impose, and upon what principles of law it is based.

{¶ 128} There are two distinct issues in this case. The first is the liability of Dr. Harold Brown, a "consultant contract psychiatrist," to third parties for the acts of violence committed by Matt Morgan, an outpatient. With respect to the issues concerning Dr. Brown, I concur in Justice Cook's dissenting opinion. While Dr. Brown may be liable in malpractice for failing to adequately treat and/or monitor his patient, I find that the imposition of liability in negligence for the actions of Matt Morgan occurring nine months after his last visit with Dr. Brown imposes an impossible standard upon the medical profession. The majority seems to leap over sound legal principles of foreseeability and causation to find a "special relation" which creates some sort of perpetual duty and strict liability. Would Dr. Brown's liability for Matt's actions have ended twelve months after his last visit? Or would potential liability exist for two years, five years or ten years? The majority provides no answers to these difficult questions. A popular axiom is that bad facts make bad law. The facts in this case are so tenuous that bad law has indeed been created.

{¶ 129} The second issue is whether the mental health agency and its employees are immune under R.C. 5122.34 for a decision *not* to hospitalize Matt Morgan. Against a backdrop of a number of social issues, the General Assembly passed R.C. 5122.34 to provide immunity from liability to various persons providing mental health services. The statute specifically provides:

"Persons, including * * * community mental health agencies, *acting in good faith*, * * * who procedurally or physically assist in the hospitalization or discharge, *determination of appropriate placement*, or in judicial proceedings of a person under this chapter, do not come within any criminal provisions, and are free from any liability to the person hospitalized or to any other person. No person shall be liable for any harm that results to any other person as a result of failing to disclose any confidential information about a mental health client, or failing to otherwise attempt to protect such other person from harm by such client. * * *" (Emphasis added.)

{¶ 130} To qualify for immunity under the statute, one must meet two requirements. The first is the duty to act "in good faith." Good faith is "that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." Black's Law Dictionary (6 Ed.1990) 693. By contrast, bad faith is the "conscious doing of a wrong because of dishonest purpose or moral obliquity." *Id*. at 139.

{¶ 131} Second, the act performed in good faith must be one for which the statute provides immunity, *i.e*., "procedurally or physically assist[ing] in the hospitalization or discharge, determination of appropriate placement, or in judicial proceedings of a person under this chapter." In an analysis consisting of only two paragraphs, the majority concludes that a decision *not* to initiate commitment procedures to involuntarily hospitalize a person is a decision *not* to get involved. The result is that the person will be protected from liability by the statute only if the decision is to involuntarily hospitalize. However, if the person decides *against* involuntary commitment to a hospital or decides upon some other form of placement, then that person is left open to liability.

{¶ 132} I fail to see how an evaluation to determine whether a patient meets the statutory criteria for involuntary hospitalization does not constitute "procedurally * * * assist[ing]" in hospitalization. Furthermore, the phrase "determination of appropriate placement" is obviously intended to cover alternatives to hospitalization. Appropriate placements may include the patient's own home setting, outpatient treatment, or a special care facility or long-term treatment facility that does not qualify as "hospitalization." A patient is generally at *least* risk to others when carefully monitored in the hospital setting; the greater risk lies with the decision not to hospitalize or to place the patient in some other "appropriate placement." These are all decisions that must be made during that *same* evaluation period to see whether the patient meets the statutory criteria for individual hospitalization.

{¶ 133} Matt Morgan's case is one of tragic consequences. All concur in hindsight that a different course of action would have been chosen had the outcome been predictable. Unfortunately, however, the consequences of mental illness are unpredictable. Medical science still hotly debates whether mental illness has a physical or chemical basis or is the result of life's difficult experiences. There is some agreement in the mental health profession as to standards of treatment. However, the ability to predict what patient with which particular mental illness will turn suddenly on society with an act of rage or violence is still, with all the advances in medicine, only a matter of speculation.

{¶ 134} As a former trial judge, I encountered many criminal defendants in my court suffering from mental illness or dealing with mental health issues. Often the crime committed did not merit incarceration. Even more often the mental illness had nothing to do with the crime committed, but was simply a facet of the defendant's personality. Few of these people would physically injure another. Therefore, unless there was a finding of criminal insanity, or mental incompetence to stand trial, a trial court does not have jurisdiction to order commitment or treatment and I was dependent on the civil system to effectuate commitment proceedings if necessary.

{¶ 135} Mental health agencies that evaluate these defendants or other indigents constantly battle problems of inadequate available treatment, placement and resources. Many drug treatment facilities will not accept a defendant or indigent with an underlying mental illness. Few can be hospitalized because most do not meet the criteria for involuntary commitment.

{¶ 136} Society puts low priority on allocating resources for mental health treatment. Mental health agencies are often underfunded. Many insurance companies do not offer coverage for this kind of treatment. Agencies are often the only available resource for help and, as such, are burdened by an overload of indigent patients. Evaluations are often based on scant information, because mental health patients may be a less than reliable source of information or history. Often there is no caring family to provide rich detail or daily logs of activities.

{¶ 137} Under these difficult circumstances, mental health professionals are required to evaluate the mentally ill. They are not doctors with high incomes. Most are underpaid and compassionate individuals. They must be dedicated and caring to be able to survive in their profession. They must struggle with the abused, the neglected, and the traumatized, many with criminal histories. In the midst of all this reality, these professionals try to make the best decision for the most unpredictable of human behavior.

{¶ 138} Today, the majority exposes thousands of mental health professionals to liability *only* if they choose not to hospitalize the outpatient. In an age where we encourage the least restrictive environment in caring for the mentally ill, we have just created the greatest incentive to do the opposite, as Justice Cook points out in her dissent. The majority appears to mandate hospitalization of all patients and to create strict liability for violent acts of the outpatient if hospitalization is not ordered. The majority is advising thousands of mental health workers that they have statutory immunity for making a choice to hospitalize if made in good faith. However, if they choose, in good faith, not to recommend hospitalization, they are completely liable to the patients themselves, and to anyone else the patient may injure because of their "special relation." I do not believe that this was the intent of the legislature. This interpretation defies even common sense. Mental health workers must now be responsible for protecting or controlling the violent propensities of their patients even in the absence of specific threats made against specific individuals and regardless of whether the professional exercised good faith when making a recommendation for placement.

{¶ 139} The record reflects that Matt Morgan exhibited few signs that would alert anyone to the tragic events of July 25, 1991. He drew a picture of a gun during psychotherapy in 1990; he attempted to hit his father; he struck a telephone pole with a baseball bat. His recorded behavioral changes (becoming quiet, withdrawn, moody, eating poorly, and talking to himself) were hardly signs that indicated a potential for the degree of violence that occurred. No one could have predicted that during a game of cards, this young man would get up from the table, go and get a gun, and shoot his family.

{¶ 140} I believe that R.C. 5122.34 applies not only to the decision to hospitalize, but also to the decision *not* to hospitalize and to decisions recommending other placement.

{¶ 141} Further, I do not agree with the majority that a special relationship between a psychotherapist and an outpatient creates some sort of "common-law duty" to take affirmative steps to protect third parties from an outpatient's violent conduct. The majority's statement that R.C. 5122.34 "does not preclude the finding" of a special relationship appears to create a new standard. This renders meaningless the immunity provisions of R.C. 5122.34 because all psychotherapists and their outpatients have a special relationship. The majority has created a new liability for the mental health profession despite the good-faith provision of R.C. 5122.34 and common-law principles of causation and foreseeability.

{¶ 142} Finally, I note that paragraphs two, three and four of the syllabus appear to apply only to "psychotherapists." I am perplexed as to whether the

majority intended the law created by this opinion to apply only to those professionals labeled as "psychotherapists" or also to psychiatrists and to the broader category of all persons in the mental health field who are involved in the care and treatment of an outpatient.

{¶ 143} It appears that the majority wanted to reach a particular result in this case, so it fashioned a new remedy outside the statute rather than interpreting the statute to reach the result. This is not our role. As tragic as the facts of this case are, the legal principles which flow from the majority's opinion are flawed. Although the professionals at Fairfield Family Counseling Center may have exercised poor judgment with respect to appropriate placement or failure to involuntarily hospitalize Matt, the law grants them immunity for what is a subjective evaluation of another's mental state.

————————————