[Cite as *Godwin v. Facebook, Inc.*, 2020-Ohio-4834.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

DEBBIE GODWIN,  :

    Plaintiff-Appellant,  :

                                  No. 109203

    v.  :

FACEBOOK, INC., ET AL.,

    Defendants-Appellees.  :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** October 8, 2020

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-18-891841

---

### *Appearances:*

Polk Kabat, L.L.P., Andrew A. Kabat, Shannon J. Polk, Mark F. Humenik, and Daniel M. Connell; Weisman, Kennedy & Berris Co., L.P.A., R. Eric Kennedy, and Daniel P. Goetz, *for appellant.*

Thompson Hine, L.L.P., and Kip T. Bollin; Kirkland & Ellis, L.L.P., Craig S. Primis, and K. Winn Allen, pro hac vice, *for appellees.*

SEAN C. GALLAGHER, J.:

{¶ 1} Debbie Godwin, as the executor of the estate of Robert Godwin, Sr., appeals the trial court's judgment in which all claims against Facebook, Inc.,

Facebook Payments, Inc., Facebook Services, Inc., Atlas Solutions, L.L.C., and CrowdTangle, Inc., were dismissed with prejudice. For the sake of clarity and expediency, the appellees will be referred to collectively as Facebook unless otherwise noted.

{¶ 2} This case arises from disturbing facts as presented through a sympathetic lens. The events underlying the current claims stem from the senseless murder of Robert Godwin, Sr., on Easter weekend in 2017. By all accounts, Robert Godwin was a good man devoted to his family and friends. On that fateful day, Robert Godwin was simply enjoying a moment in a local park when accosted by a complete stranger determined to murder anyone in a horrifyingly public manner. Nevertheless, the claims before this court are not those leveled against the perpetrator of the crime. Instead, the primary focus of this appeal is the purely legal implications of the relationship between a social media conglomerate and its customers, and whether the corporation can be liable for failing to intervene in one of its customer's criminal acts.

{¶ 3} Robert Godwin, Sr., Godwin's father, was murdered by Steve Stephens — a video of the murder was briefly posted to Stephens's social media account, part of the social media network that is owned and managed by Facebook, Inc. Stephens committed suicide two days later. Godwin filed a wrongful death action against Stephens's estate, all the while maintaining that the estate is merely a

"nominal defendant" in the action.[1] In addition, Godwin included allegations against Facebook for its alleged failure to warn Robert Godwin of Stephens's intention, of which Facebook should have been aware based on a statement Stephens posted before the attack and based on Facebook's in depth and financially motivated use of its users' information. On the day of the tragic events, Stephens posted an ominous, but relatively ambiguous, statement on his social media account. In that message, Stephens stated:

> FB my life for the pass year has really been fuck up!!! lost everything ever had due to gambling at the Cleveland Jack casino and Erie casino...I not going to go into details but I'm at my breaking point I'm really on some murder shit...FB you have 4 minutes to tell me why I shouldn't be on deathrow!!!! dead serious #teamdeathrow.[2]

"Minutes" later, Stephens randomly approached Robert Godwin, who was sitting in a local park. Stephens pulled out a handgun and shot him after a brief dialogue.

{¶ 4} Godwin asserted five causes of action against Facebook: (1) common law negligence for failing to warn the police of Stephens's threat; (2) civil recovery for a criminal act in failing to report a terrorist threat made by Stephens; (3) statutory negligence for failing to warn in violation of R.C. 2921.22; (4) wrongful death; and (5) survivorship. There are two discrete veins of liability underlying

---

[1] Brief of Appellant, page 3. "'[I]t may be said that a "nominal party" is one whose presence in the action is either: (1) merely formal; or, (2) unnecessary for a just and proper resolution of the claim(s) presented.'" *State ex rel. Yeaples v. Gall*, 141 Ohio St.3d 234, 2014-Ohio-4724, 23 N.E.3d 1077, ¶ 22, quoting *Smith v. Inland Paperboard & Packaging, Inc.*, 11th Dist. Portage No. 2007-P-0088, 2008-Ohio-6984, ¶ 41.

[2] The passage is reproduced as it was presented in Godwin's complaint.

Godwin's claims — one relating to Stephens's message published before the murder and another relating to Facebook's use of its users' information.

**{¶ 5}** In the complaint, Godwin alleged that her negligence claims "focuses on *Facebook's* own conduct in operating a separate and distinct business — a business that focuses on the collection, analysis, use, exploitation and/or sale of [users'] information" (hereinafter "data-mining practices"). (Emphasis added.) Complaint at ¶ 2. According to Godwin, a duty was owed because of "[t]he *Facebook Defendants'* special business relationship with [their] users and the acquisition of intimate knowledge/information relating to their activities, intentions, wishes, desires and even their specific location." (Emphasis added.) *Id.* at ¶ 7. However, Godwin's claims "do not require the Facebook Defendants to monitor, edit, withdraw or block any content supplied by [their] users." *Id.* at ¶ 8. Throughout the complaint, it is alleged that Facebook utilizes its data-mining practices for financial gain, and from those general allegations, Godwin concludes that Facebook owes a duty to control its users' conduct outside of their business-consumer relationship. There are no factual allegations identifying anything specifically discovered as a result of Facebook's data-mining practices, except for the fact that Stephens owned and used firearms — although there are no allegations that Stephens's possession or use of those firearms was illegal or otherwise unsafe. Godwin nevertheless opines that Stephens's ownership and use of firearms was "suggestive of his violent tendencies."

{¶ 6} In the third count of the complaint, Godwin alleges that Facebook "failed to take any steps to warn or protect those threatened by Mr. Stephens' stated intention to do some 'murder shit' by alerting law enforcement authorities" and such an act was in contravention of the duty established in R.C. 2921.22 "to warn the general public about Mr. Stephens' commission of a felony." *Id.* at ¶ 102-103. R.C. 2307.60 creates a statutory cause of action for those injured by criminal acts in Ohio to seek compensation for damages from the perpetrator of the criminal act. Godwin alleges that Facebook's failure to report the "making terroristic threat" crime, committed by Stephens through the posting of the statement, was in violation of R.C. 2921.22, and therefore, Facebook could be held liable for their inaction under R.C. 2307.60. Although Godwin framed the claim as two separate negligence and statutory claims, the negligence claim advanced in count three is merely duplicative of the civil-recovery statutory claim advanced in count two and shall be treated as a single claim.

{¶ 7} Accordingly, there are two claims or theories of liability advanced in the complaint against Facebook: (1) the common law negligence claim, based on the failure to warn Robert Godwin of Stephens's dangerous propensity of which Facebook was aware through its data-mining practices, which is the underlying negligence theory upon which the wrongful death and survivorship claims arise and (2) the civil-right-of-recovery claim based on R.C. 2921.22 and 2307.60 stemming from Stephens's message posted to his social network page "minutes" before Robert Godwin's tragic and senseless murder.

{¶ 8} The trial court concluded that Godwin failed to state any claim upon which relief could be granted under Civ.R. 12(B)(6). After dismissing the allegations against Facebook, the trial court quashed a subpoena Godwin issued to Facebook seeking the contents of Stephens's social-media account; the subpoena was issued after Facebook had been dismissed from the case and was no longer a party to the action as contemplated under Civ.R. 45. That subpoena was in furtherance of the pending claims against Stephens's estate. In this appeal, Godwin also challenges the trial court's interlocutory decision to quash the subpoena.

{¶ 9} We sua sponte ordered the parties to brief the following issues:

> whether this court has jurisdiction to review: (1) The order granting the motion to quash filed by the appellees (*see In re Grand Jury Proceeding of Doe*, 150 Ohio St.3d 398, 2016-Ohio-8001, 82 N.E.3d 1115; *Hanick v. Ferrara*, 7th Dist. Mahoning No. 18 MA 0073, 2019-Ohio-880, ¶ 25; *In re Estate of Adkins*, 4th Dist. Lawrence No. 16CA22, 2016-Ohio-5602; *In re Tracy M.*, 6th Dist. Huron No. H-04-028, 2004-Ohio-5756); and (2) the order granting the appellees' motion to dismiss (*see Rae-Ann Suburban, Inc. v. Wolfe*, 8th Dist. Cuyahoga No. 107536, 2019-Ohio-1451).

Generally speaking, the granting of a motion to quash a subpoena is not considered a final appealable order. *See, e.g., Ferrara*. In addition, in *Wolfe,* the panel concluded that a "partial final order is not appealable pursuant to Civ.R. 54(B) if pending unresolved claims 'touch upon the very same facts, legal issues and circumstances' as the resolved claims. *Wolfe* at ¶ 16, quoting *Altenheim v. Januszewski*, 8th Dist. Cuyahoga No. 105860, 2018-Ohio-1395, ¶ 3-7, 10-13.

{¶ 10} Facebook and Godwin agreed that *Wolfe* was distinguishable, based on the fact that Facebook's alleged nonfeasance was independent of and unrelated

to the underlying action against Stephens who committed the murder, and therefore, the order granting the motion to dismiss was final and appealable under R.C. 2505.02 and Civ.R. 54(B). We agree with the parties' assessment. *Alexander v. Buckeye Pipe Line Co.*, 49 Ohio St.2d 158, 160, 359 N.E.2d 702 (1977); *Noble v. Colwell*, 44 Ohio St.3d 92, 540 N.E.2d 1381 (1989), syllabus; *see generally Doolin v. Old River Yacht Club L.P.*, 8th Dist. Cuyahoga No. 87653, 2006-Ohio-5922. Godwin's allegations against Facebook are wholly independent of her claims against the nominal defendant who is alleged to have committed murder. *Wolfe* is not applicable, and neither party otherwise challenges our jurisdiction to review the judgment of dismissal. App.R. 16(A)(7).

{¶ 11} With respect to the motion to quash, however, the parties disagree. A motion to quash a discovery subpoena is generally considered "a proceeding ancillary to an action" and therefore a provisional remedy pursuant to R.C. 2505.02(A)(3). *In re Grand Jury Proceeding of Doe*, at ¶ 19. Thus, in order to determine whether such a provisional remedy qualifies as a final order pursuant to R.C. 2505.02(B)(4), the party appealing must demonstrate both that

> (a) The order in effect determines the action with respect to the provisional remedy and prevents a judgment in the action in favor of the appealing party with respect to the provisional remedy.
>
> (b) The appealing party would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action.

In support of our jurisdiction over the discovery dispute, Godwin claims the *granting* of a motion to quash is final under R.C. 2505.02 based on *Future*

*Communications, Inc. v. Hightower*, 10th Dist. Franklin No. 01AP-1175, 2002-Ohio-2245, in which it was concluded that the *denial* of a motion to quash a discovery subpoena could be considered final and appealable. The denial of a motion to quash requires a nonparty to produce documents, an act that cannot be remedied at the conclusion of the case after the documents have been produced. *Id.* For this reason, the denial of a motion to quash is generally considered a final appealable order because the appealing party lacks any meaningful remedy following the final judgment as contemplated under R.C. 2505.02(B)(4). *Id.* The granting of a motion to quash does not implicate the same concerns. *Ferrara* at ¶ 25; *McCarthy v. Anderson*, 5th Dist. Licking No. 17 CA 36, 2018-Ohio-1993, ¶ 19; *In re Estate of Adkins* at ¶ 9; *In re Tracy M.* at ¶ 29.

{¶ 12} In light of the fact that the motion to quash was granted, the interlocutory order does not determine the action and prevent a judgment in the action in favor of Godwin with respect to the discovery issue — any discovery-related issues with respect to Godwin's claims against Stephens's estate, such as those presented by the discovery subpoena issued to Facebook as a nonparty, can be resolved in a direct appeal following the conclusion of the case. As a result, we lack jurisdiction to consider the trial court's interlocutory order granting Facebook's motion to quash a subpoena. The only issue ripe for our review is whether the trial court erred in dismissing the cause against Facebook under Civ.R. 12(B)(6).

{¶ 13} "'A motion to dismiss for failure to state a claim upon which relief can be granted is procedural and tests the sufficiency of the complaint.'" *State ex rel.*

*Belle Tire Distribs. v. Indus. Comm. of Ohio*, 2018-Ohio-2122, 154 Ohio St.3d 488, 116 N.E.3d 102, ¶ 17, quoting *State ex rel. Hanson v. Guernsey Cty. Bd. of Commrs.*, 65 Ohio St.3d 545, 548, 1992-Ohio-73, 605 N.E.2d 378.  A court may grant a Civ.R. 12(B)(6) motion to dismiss "only when the complaint, when construed in the light most favorable to the plaintiff and presuming all the factual allegations in the complaint are true, demonstrates that the plaintiff can prove no set of facts entitling him to relief." *Id.*, citing *Mitchell v. Lawson Milk Co.*, 40 Ohio St.3d 190, 192, 532 N.E.2d 753 (1988).  A trial court's decision to grant a Civ.R. 12(B)(6) motion to dismiss is reviewed de novo.  *LGR Realty, Inc. v. Frank & London Ins. Agency*, 152 Ohio St.3d 517, 2018-Ohio-334, 98 N.E.3d 241, ¶ 10.  In a de novo review, we must independently review the record and afford no deference to the trial court's decision. *Moncrief v. Bohn*, 2014-Ohio-837, 9 N.E.3d 508, ¶ 4 (8th Dist.).

**{¶ 14}**  "Under Ohio's liberal pleading rules, all that is required of a plaintiff bringing suit is '(1) a short and plain statement of the claim showing that the party is entitled to relief, and (2) a demand for judgment for the relief to which the party claims to be entitled.'"  *Hammon v. Huntington Natl. Bank*, 2018-Ohio-87, 102 N.E.3d 1248, ¶ 59 (8th Dist.), quoting *York v. Ohio State Highway Patrol,* 60 Ohio St.3d 143, 144-145, 573 N.E.2d 1063 (1991).  "However, even under Ohio's notice-pleading standard, a cause of action must be factually supported and courts need not accept bare assertions of legal conclusions."  *Enduring Wellness, L.L.C. v. Roizen*, 8th Dist. Cuyahoga No. 108681, 2020-Ohio-3180, ¶ 24, citing *Tuleta v. Med. Mut. of Ohio*, 2014-Ohio-396, 6 N.E.3d 106, ¶ 28 (8th Dist.), and *Harper v.*

*Weltman, Weinberg & Reis Co., L.P.A.*, 8th Dist. Cuyahoga No. 107439, 2019-Ohio-3093, ¶ 33. To the contrary, unsupported legal conclusions are not accepted as true for purposes of a motion to dismiss. *Mitchell,* citing *Schulman v. Cleveland*, 30 Ohio St.2d 196, 198, 283 N.E. 2d 175 (1972).

{¶ 15} As briefly discussed, Godwin asserted five causes of action against Facebook: (1) common law negligence for failing to warn of Stephens's propensity for violence of which Facebook was aware based on its data-mining practices; (2) civil recovery for a criminal act in failing to report a terrorist threat made by Stephens; (3) statutory negligence for failing to warn the public of Stephens's published threat in violation of R.C. 2921.22; (4) wrongful death; and (5) survivorship. As stated, those five claims can be separated into two discrete veins of liability that will be separately addressed: the negligence claims and the statutory right-to-recovery claims.

{¶ 16} In order to "'maintain a wrongful death action on a theory of negligence, a plaintiff must show (1) the existence of a duty owing to plaintiff's decedent, (2) a breach of that duty, and (3) proximate causation between the breach of duty and the death.'" *Estate of Ridley v. Hamilton Cty. Bd. of Mental Retardation & Dev. Disabilities*, 102 Ohio St.3d 230, 2004-Ohio-2629, 809 N.E.2d 2, ¶ 14, quoting *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92, 529 N.E.2d 449 (1988). Thus, Godwin's negligence claims all fall under the same umbrella — each of the alleged tort claims require Godwin to demonstrate that a

duty was owed to prevent Stephens from causing injury to another person under Ohio law.

{¶ 17} It is well settled that there is no duty to control the conduct of a third person to prevent the commission of physical harm to another person "unless (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relationship exists between the actor and the other which gives to the other the right to protection." *Hite v. Brown*, 100 Ohio App.3d 606, 613, 654 N.E.2d 452 (8th Dist.1995), citing *Gelbman v. Second Natl. Bank of Warren*, 9 Ohio St.3d 77, 79, 458 N.E.2d 1262, 1263 (1984) (*Gelbman* adopted the Restatement of the Law 2d, Torts, 122, Section 315 (1965)), and *Fed. Steel & Wire Corp. v. Ruhlin Constr. Co.*, 45 Ohio St.3d 171, 173, 543 N.E.2d 769, 772 (1989), fn. 1.

{¶ 18} Before discussing the legal framework under which Godwin's claims must be analyzed, it is important to note that the authority upon which Godwin relies is largely inapplicable. There appears to be some confusion as to the nature of the "special relations" Godwin claims to exist for the purposes of stating a claim for relief against Facebook.

{¶ 19} According to Godwin, the complaint is well pleaded because Ohio law recognizes a special relationship as between a business owner and invitee (*Simpson v. Big Bear Stores Co.*, 73 Ohio St.3d 130, 135, 652 N.E.2d 702 (1995)), a common carrier and its passengers, an innkeeper and its guests, a possessor of land and an invitee, a custodian and individual taken into her custody, and an employer and her

employee (*Jackson v. Forest City Ents., Inc.*, 111 Ohio App.3d 283, 285, 675 N.E.2d 1356 (8th Dist.1996), citing Restatement of the Law 2d, Torts 122, Section 314A.) Godwin seeks to extend those relationships to a social media company and its users. The unifying theme from those theories of liability, however, is that a duty to protect exists as between the tortfeasor and the injured party. Restatement of the Law 2d, Torts 122, Section 314A, Section 315(b). That line of reasoning is not implicated by Godwin's allegations, in which it is claimed that Facebook is alleged to have a special relationship with Stephens that imposes a duty upon Facebook to control Stephens's conduct to prevent harm to another (in this case Robert Godwin). There are no allegations in the complaint that Facebook shared a special relation with Robert Godwin for the purpose of establishing a duty of protection that would implicate the second exception as set forth in the Restatements Section 315 — the duty to protect the injured person. *See, e.g., Simpson* (although a business owner owes a duty to protect business invitees from criminal acts it knows or should have known of the substantial risk presented under Restatement of the Law 2d, Torts 122, Section 315, that duty does not extend off the business owner's premises); *accord Fletcher v. Maryland Transit Administration,* 741 Fed.Appx. 146, 151 (4th Cir.2018) (school system is not "in charge" of its students after hours and off the school grounds for the purposes of nonfeasance liability).

{¶ 20} In addition, Godwin's theory primarily relies on the presumption that a duty should be imposed because Facebook possessed the ability to control Stephens's conduct through its expansive insight into users' thought processes

gained through Facebook's data-mining practices. According to the drafters of the Restatement of the Law 2d, Torts 122, Section 315 (1965), as adopted in *Gelbman*, 9 Ohio St.3d 77, 79, 458 N.E.2d 1262 (1984), however, there is generally no duty to control the conduct of a third person to prevent harm to another even though "the actor realizes that he has the ability to control the conduct of a third person, and could do so with only the most trivial of efforts and without any inconvenience to himself." Restatement of the Law 2d, Torts 122, Section 315, Comment b; *Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 300, 1997-Ohio-194, 673 N.E.2d 1311, fn. 5. Godwin's reliance on Facebook's ability to control its users' conduct does not give rise to a duty to control them as contemplated under Ohio law.

{¶ 21} With the limitations on Godwin's arguments in mind, the threshold issue — in cases seeking to impose liability for an actor's failure to prevent harm to another that is caused by a third person — is, whether the actor has a special relationship with the third party that gives rise to a duty to control that third person's conduct. There are few recognized instances in which an actor has the requisite relationship with a third person as to give rise to a duty to control that person's conduct. "Sections 316 to 319 [of Restatement of the Law 2d, Torts 122] set forth the [special] relations between the actor (the alleged tortfeasor) and the third person which require the actor to control the third person's conduct" for the purpose of preventing harm to another. *Estates of Morgan* at 294. The threshold inquiry is whether the complaint alleges sufficient operative facts to establish the existence of

the "special relations" as defined in the Restatement of Torts. The traditional Restatement analysis is the tort-law road map in Ohio.

{¶ 22} In *Estates of Morgan*, for example, the Ohio Supreme Court faced the question of expanding the exception to the "no duty to act" rule to a psychiatrist-outpatient relationship. *Id.* Before that case arose, it had been concluded that the psychiatrist-patient relationship is a "special relation" based on the psychiatrist taking "charge" of the patient in the hospital setting. *Littleton v. Good Samaritan Hosp. & Health Ctr.*, 39 Ohio St.3d 86, 92, 529 N.E.2d 449 (1988) ("Even though Theresa was a voluntary patient, we find that Dr. Murray had sufficient charge of Theresa in the hospital setting such that a special relation was established."). *Littleton* relied on the traditional Restatement analysis to arrive at its conclusion. Under Section 319 of the Restatement of Torts, a "special relation" exists "when one takes charge of a person whom he knows or should know is likely to cause bodily harm to others if not controlled." *Id.* *Estates of Morgan* expanded that precedent to include a psychiatrist-outpatient relationship along with the traditional hospital setting, presuming the psychiatrist had "taken charge" of her patient in the outpatient setting. *Id.*

{¶ 23} Importantly, however, although given the opportunity to expand Ohio tort law to include its own common law test to determining whether the requisite "special relation" exists, the Ohio Supreme Court instead adhered to the analysis set forth in the Restatement of Torts. *Id.* As the Ohio Supreme Court recognized, courts need not avoid the "traditional Restatement analysis" when

expanding the scope of the exceptions to the no-duty-to-act rule. *Id.* at 294. "Most courts" actually engage in the traditional Restatement analysis to reach those ends, but through an expansive reading of the applicable provision. *Id.* at 296. Ohio continues to follow that the trend. *See also Carter v. Reese,* 148 Ohio St.3d 226, 2016-Ohio-5569, 70 N.E.3d 478, ¶ 18.

{¶ 24} Under the traditional Restatement analysis, there are five recognized "special relations" that justify imposition of liability for nonfeasance. A parent owes a duty to control the conduct of his or her child (Section 316); a master owes a duty to control the conduct of his or her servant (Section 317); the possessor of land or chattels owes a duty to control the conduct of a licensee (Section 318); an actor in charge of a person with dangerous propensities owes a duty to control such a person (Section 319); and an actor having legal custody of another owes a duty to control the other's conduct (Section 320). Restatement of the Law 2d, Torts 122, Sections 316-320. "In the absence of a special relationship sufficient to trigger one of these exceptions, a private party is not liable for failing, either intentionally or inadvertently, to exercise control over the actions of a third party so as to protect others from harm." *McCloskey v. Mueller*, 446 F.3d 262, 268 (1st Cir.2006).

{¶ 25} In this appeal, Godwin claims that Facebook has taken charge of a person who it knew or should have known was likely to harm to others if not controlled. The primary focus of the complaint, however, is setting forth allegations that Facebook maintains the ability to control Stephens and possessed knowledge of Stephens's propensity for violence gained through its data-mining practices — both

of which we accept as true for the purposes of the Civ.R. 12(B)(6) review standard. To this end, Godwin has alleged that Facebook's data-mining practices should have revealed Stephens's propensity to commit murder and that Facebook had the capabilities to exert control over Stephens outside the social-media network by calling authorities. Godwin, however, has not alleged operative facts that could establish Facebook to have been "in charge" of Stephens as contemplated under the Restatement of the Law 2d, Torts 122 Section 319. *See id.* at Section 319, illustrations 1-2. Control is not the defining characteristic. Restatement of the Law 2d, Torts 122, Section 315, Comment b.

{¶ 26} In this case, there are no allegations supporting a theory that Facebook voluntarily or involuntarily took charge of Stephens such that the duty to wield its control over Stephens arose. This type of taking-charge relationship is exemplified by the physician-patient or psychiatrist-patient relationship, which "arises from an express or implied contract between the physician and patient and imposes on the physician a fiduciary duty to exercise good faith" in treating the patient. *Cromer v. Children's Hosp. Med. Ctr. of Akron*, 142 Ohio St.3d 257, 2015-Ohio-229, 29 N.E.3d 921, ¶ 25, citing *Lownsbury v. VanBuren*, 94 Ohio St.3d 231, 235, 2002-Ohio-646, 762 N.E.2d 354. Similarly, other states have relied on Section 319 in imposing liability for the nonfeasance of a parole or probation officer who took charge of a released offender. *Saint-Guillen v. United States*, 657 F.Supp.2d 376, 384 (E.D.N.Y.2009) (string citing state supreme court decisions). In reviewing whether one "takes charge" of another, courts typically review the degree of

oversight between the actor and the third person. For example, in *Small v. McKennan Hosp.*, 403 N.W.2d 410, 414 (S.D.1987), it was concluded that a probation officer had not "taken charge" of the probationer for the purpose of imposing liability for nonfeasance because the probationer was "allowed to live" on his own and was independently employed — demonstrating the probationer's independence from the probation officer. *Id.*; *see also K.R. v. Visionquest Natl., Ltd.*, E.D.Pa. No. 17-4689, 2018 U.S. Dist. LEXIS 73846, at 6 (Apr. 25, 2018) (juvenile detention facility housing residents with history of sexual victimization was sufficiently "in charge" of the third party for the purpose of demonstrating the existence of a "special relation" and imposing liability for nonfeasance).

{¶ 27} At the minimum the duty to act in this case requires an existing relationship between the defendant and the third person over whom "charge" is asserted. Godwin has not cited any authority for the proposition that a social media company "takes charge" of its users to the same extent that a medical or mental health professional takes charge of her patient or a parole or probation officer takes charge of her probationer for the purposes of expanding the theory of liability. Although the line between a contractual, business-consumer relationship and a physician-patient relationship may at one point overlap, this case does not present such a question. The complaint is devoid of any allegations of fact that, if proven, would establish the requisite element of Facebook taking "charge" of its users. *See, e.g., Dyroff v. Ultimate Software Group, Inc.*, 934 F.3d 1093, 1101 (9th Cir.2019) (failure to warn claim correctly dismissed in light of the lack of a special relationship

between the social media site and the user); *Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir.2014) ("simply invoking the label 'special relationship'" does not transform an action into a tort action.); *see also Assur. Co. of Am. v. York Internatl., Inc.*, 305 Fed.Appx. 916, 926 (4th Cir.2009) (a contractual agreement as between two parties is not an identified "special relation" for the purposes of imposing liability upon nonfeasance).

{¶ 28} In the alternative, Godwin asks this court to declare that a social media business shares a special relationship with its customers because the "no duty to act" rule is "revolting to any moral sense" and is "inherently unfair." In this respect, Godwin maintains that common law foreseeability analysis would result in the imposition of a duty upon which Facebook could be deemed liable. This line of argument is without merit. "Foreseeability alone does not create a duty; instead, it is one of a number of factors that must be considered." *Estates of Morgan*, 77 Ohio St.3d at 293, 1997-Ohio-194, 673 N.E.2d 1311; *Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653, 666 (R.I.2009), citing *Ferreira v. Strack*, 636 A.2d 682, 688 n. 4 (R.I.1994). If one has no duty to act based on the absence of a special relation with the third person, the foreseeability of the resulting harm is irrelevant — there is no duty to act as a matter of law. *See, e.g., Armstrong v. Best Buy Co., Inc.*, 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088, ¶ 5 (the open-and-obvious doctrine obviates the duty to act despite the foreseeability of the harm); *Simpson*, 73 Ohio St.3d at 134, 1995-Ohio-203, 652 N.E.2d 702.

{¶ 29} Pursuant to Civ.R. 12(B)(6), Godwin has not stated a negligence claim upon which relief could be granted in order to impose liability for Facebook's alleged nonfeasance. None of Godwin's allegations demonstrate the possibility of proving the existence of a special relationship, as contemplated under Ohio tort law and as required to establish the existence of a duty.[3] Further, Godwin's request to seek discovery to prove the existence of the special relation is to no avail. Discovery cannot be used to prove that which has not been alleged in the complaint. The trial court did not err in dismissing the negligence claims.

{¶ 30} And finally, the trial court did not err in dismissing the statutory claim for damages stemming from a criminal act. Under R.C. 2307.60(A), "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law * * *."[4] Godwin claims that Facebook committed the misdemeanor crime, under R.C. 2921.22, of failing to report another's commission of a felony, and is therefore liable for the damages caused to Robert Godwin under R.C. 2307.60 because it is alleged that immediately reporting the crime would have allowed authorities to prevent the murder. According to Godwin, Stephens's posted content on the day of the murder,

---

[3] Facebook also asserted immunity as a defense under the Communications Decency Act of 1996, 47 U.S.C. 230. In light of our conclusion that Godwin has failed to state a claim for relief under Ohio law, we need not resolve the federal question.

[4] The "unless specifically excepted by law" arguably implicates the statutory immunity conferred through the Communications Decency Act, 47 U.S.C. 230(c) in light of Godwin's reliance on the user-generated content to substantiate her claim. Once again, we need not consider the immunity argument in light of the outcome under state law analysis.

FB my life for the pass year has really been fuck up!!! lost everything ever had due to gambling at the Cleveland Jack casino and Erie casino...I not going to go into details but I'm at my breaking point I'm really on some murder shit...FB you have 4 minutes to tell me why I shouldn't be on deathrow!!!! dead serious #teamdeathrow

constituted a per se "terroristic threat" under Ohio law.

{¶ 31} In order for Godwin to have stated a claim based on R.C. 2307.60 against Facebook, there must be allegations that Stephens's post violated the "making terroristic threat" statute — without allegations in support of the existence of a crime, there was nothing for Facebook to report. R.C. 2909.23, entitled "making terroristic threat" provides that "[n]o person shall threaten to commit or threaten to cause to be committed a specified offense when * * * [t]he person makes the threat with purpose to * * * [i]ntimidate or coerce a civilian population" and "as a result of the threat, the person causes a reasonable expectation or fear of the imminent commission of the specified offense." "Specified offense" is defined, in pertinent part, as a felony offense of violence, such as murder, or a violation of R.C. 2909.23 ("making terroristic threat"). R.C. 2909.21(M).

{¶ 32} Godwin's allegations with respect to the statutory claim are limited to the conclusions that (1) the "Facebook Defendants were aware of statements made by Mr. Stephens which constituted threats that were made with the intent to intimidate or coerce a civilian population"; (2) "Mr. Stephens' threats caused a reasonable expectation of the imminent commission of making terroristic threats"; and (3) the "Facebook Defendants were aware that Mr. Stephens was engaged in the commission of a felony." The single factual allegation related to Stephens's

statement was that "Steve Stephens, had engaged in criminal conduct by making intimidating and coercive threats of violence."

{¶ 33} Those allegations are insufficient to state a prima facie claim upon which relief can be granted. "Under Ohio's notice-pleading standard, a cause of action must be factually supported and courts need not accept bare assertions of legal conclusions." *Roizen*, 8th Dist. Cuyahoga No. 108681, 2020-Ohio-3180, at ¶ 23-24, citing *Tuleta*, 2014-Ohio-396, 6 N.E.3d 106, at ¶ 28 (8th Dist.), and *Harper*, 8th Dist. Cuyahoga No. 107439, 2019-Ohio-3093, at ¶ 33. Unsupported legal conclusions are not accepted as true for purposes of a motion to dismiss. *Mitchell*, 40 Ohio St.3d at 193, 532 N.E.2d 753, citing *Schulman*, 30 Ohio St.2d at 198, 283 N.E.2d 175.

{¶ 34} Godwin is solely relying on Stephens's statement to demonstrate that a "making terroristic threat" crime was committed against the civilian population, but there are no factual allegations demonstrating that Stephens intended to intimidate the civilian population and as a result of that attempt to intimidate, the civilian population had a reasonable expectation of fear that Stephens would commit a "specified offense." The sole allegation in the complaint related to the "reasonable expectation" element of the "making terroristic threat" crime is that "Mr. Stephens' threats caused a reasonable expectation of *the imminent commission of making terroristic threats.*" (Emphasis added.) As circular as it sounds, under R.C. 2909.21(M), "making terroristic threats" under R.C. 2909.23 is considered a "specified offense" under amendments to the statute that became effective April 13,

2006 — a legal impossibility since the "making terroristic threat" crime cannot be proven without the commission of the specified offense, which can never occur if the crime itself is the predicate offense.

{¶ 35} Nevertheless, Godwin continually alludes to the fact that the basis of the "making terroristic threat" crime is Stephens's intent "to do some murder shit" — a proposition that is not at all self-evident from the actual phrasing of Stephens's statement, but when considered in the context of Godwin's allegations, the threat to commit murder, at a minimum, constitutes a "specified offense." However, there are no factual allegations, or even legal conclusions for that matter, that the civilian population had a reasonable expectation that Stephens intended to commit murder before Stephens committed the heinous act. In this appeal, Godwin asks for that to be assumed because "certainly, someone intending to do some random 'murder shit' is *likely* to cause fear in a reasonable person's mind." Supposition as to what could occur is not sufficient. In general, the reasonableness of fear stemming from a threat of violence is a fact-intensive inquiry. *J.D. v. G.D.*, 9th Dist. Medina No. 18CA0050-M, 2019-Ohio-4391, ¶ 14, quoting *J.K. v. M.K.*, 9th Dist. Medina No. 13CA0085-M, 2015-Ohio-434, ¶ 11. In light of this, there must be allegations of operative fact that the person making a threat upon a civilian population caused "a reasonable expectation or fear of the imminent commission of the specified offense." An isolated comment "to do some murder shit," without context, is insufficient to satisfy the well-pleaded complaint rule.

{¶ 36} There are no allegations that Stephens had a criminal history known to the public, that he was a known terrorist who committed terrorist acts in the past, that any particular civilian in the Cleveland area even saw the post before the murder occurred, or that any person reasonably believed Stephens would imminently commit murder, nor is there any other factual allegation upon which it could be concluded that the message could reasonably cause the public to fear the imminent commission of a "specified offense." Further, any allegations of Stephens's conduct after the murder, which understandably would have given the public cause to reasonably fear Stephens's threats, are irrelevant to the claim that Facebook violated an obligation to report the terroristic threats to prevent the murder of Robert Godwin. If the "making terroristic threat" crime did not arise until after the murder, in other words, the public feared future random murders would occur after the commission of the first one, then Facebook's failure to report that crime could not, as a matter of law, be the cause of injury to Godwin — reporting the after-the-fact crime would not have prevented the injury to Godwin.

{¶ 37} In order to satisfy the well-pleaded complaint rule, the plaintiff must include allegations of operative facts that satisfy the elements of each claim. Bare assertions of legal conclusions are insufficient to withstand a motion to dismiss under Civ.R. 12(B)(6). In the absence of any allegations that Stephens's threat (even if one considers his mentioning of "being on some murder shit" as a threat to commit murder) caused a reasonable fear of the imminent commission of murder, Godwin has failed to state a claim upon which relief can be granted. Taking every allegation

in the complaint as true, Godwin has not presented a well-pleaded complaint upon which it could be concluded that Stephens's post constituted a "making terroristic threat" crime, as defined by Ohio law, prior to the murder. *Gibbs v. Burley*, 10th Dist. Franklin No. 19AP-141, 2020-Ohio-38, ¶ 16, quoting *Mitchell*, 40 Ohio St.3d at 193, 532 N.E.2d 753 (a well-pleaded complaint "must include factual allegations going to each element of the claim, and conclusory statements without any factual allegations in support are insufficient). Accordingly, there is no set of facts upon which it could be concluded that Facebook did not fail to report the commission of a felony offense, in order to prevent the crime from occurring, for which civil liability could be imposed under R.C. 2307.60 for the injuries caused to Robert Godwin. The trial court's decision to dismiss the statutory claims was not in error.

{¶ 38} We affirm.

It is ordered that appellees recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

SEAN C. GALLAGHER, JUDGE

MARY J. BOYLE, P.J. CONCURS;
PATRICIA ANN BLACKMON, J., CONCURS WITH SEPARATE OPINION

PATRICIA ANN BLACKMON, J., CONCURRING WITH SEPARATE OPINION:

{¶ 39} I concur with the majority opinion and write separately to express my concern over the lack of developing law governing the relationship social media companies have with their users and the general public; the scope of duty social media companies may, or may not, owe to their users; and whether public safety outweighs a company's bottom line. First, it appears to me that there is a duty. Going back to Justice Cardozo's well-known decision in *Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E.99 (May 29, 1928), the issue of duty is central to the evolution of modern tort law. "The risk reasonable to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." *Id.* at 343.

{¶ 40} The law of torts is elastic, and the concept of "duty," as related to liability in torts, expanded as society advanced. For example, in *Paugh v. Hanks*, 6 Ohio St.3d 72, 451 N.E.2d 759 (1983), the Ohio Supreme Court recognized for the first time negligent infliction of serious emotional distress as a viable cause of action.

> While some may view our decision today as an unsettling quantum leap into this difficult area of the law, the situation is one of paramount necessity in fitting the law to the dynamics and nuances of modern twentieth century society. We view our decision today as a bold and promising step in ensuring an individual's right to emotional tranquility which is redressable in an action against a blameworthy defendant for the negligent infliction of serious emotional distress.

*Id.* at 74. *See also Dillon v. Legg,* 68 Cal.2d 728, 747, 441 P.2d 912 (Cal. 1968) (one who observes the accident of a loved one is "granted recovery because she was in the 'zone of danger' * * *"); *Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897 (Cal.

1963) (establishing strict liability for dangerously defective products); *Yates v. Mansfield Bd. of Edn.*, 102 Ohio St.3d 205, 2004-Ohio-2491, 808 N.E.2d 861 (noting that R.C. 2151.421 imposes a mandatory duty to report suspected child abuse on those with special relationships with children); *Randi W. v. Muroc Joint Unified School Dist.,* 14 Cal.4th 1066, 1081, 929 P.2d 582 (Cal.1997) ("the writer of a letter of recommendation owes to third persons a duty not to misrepresent the facts * * * if making these misrepresentations would present a substantial, foreseeable risk of physical injury to the third persons").

{¶ 41} Traditionally, a duty of care did not include a duty to protect third parties. *See generally, Hill v. Sonitrol of Southwestern Ohio*, 36 Ohio St.3d 36, 521 N.E.2d 780 (1988). However, looking through the lens of foreseeability, if the defendant has a "special relationship" with either the bad actor or the person in danger, a legal duty may arise. *See Simpson v. Big Bear Stores Co.*, 73 Ohio St.3d 130, 652 N.E.2d 702 (1995).

{¶ 42} "[O]ne of the single most celebrated cases in the recent history of American tort law" is *Tarasoff v. Regents of Univ. of California*, 17 Cal.3d 425, 439, 551 P.2d 334 (1976). Peter F. Lake, *Article: Revisiting Tarasoff*, 58 Alb.L.Rev. 97, 97 (1994). *Tarasoff* recognized the special relationship between a psychotherapist and his or her patient, and established a duty on psychotherapists to protect potential victims from dangerous patients. "Once a therapist does in fact determine, or under applicable professional standards reasonably should have determined, that

a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." *Tarasoff* at 439.

{¶ 43} Public policy and public opinion shape the concept of what constitutes a special relationship in terms of imposing a legal duty.

> Accordingly, there is no more magic inherent in the conclusory term "special relation" than there is in the term "duty." Both are part and parcel of the same inquiry into whether and how the law should regulate the activities and dealings that people have with each other. As society changes, as our sciences develop and our activities become more interdependent, so our relations to one another change, and the law must adjust accordingly. "Duty" is not a rigid formalistic concept forever embedded in the standards of a simplistic yesteryear. Relations perhaps regarded as tenuous in a bygone era may now be of such importance in our modern complicated society as to require certain assurances that risks associated therewith be contained. These principles do not shed their inherent flexibility when applied in the context of a defendant's duty to control the violent conduct of a third person.

*Estates of Morgan v. Fairfield Family Counseling Ctr.*, 77 Ohio St.3d 284, 298, 673 N.E.2d 1311 (1997). *See also* Prosser & Keeton, *Law of Torts*, Section 55, 357-358 (5th Ed., 1984) ("'duty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection"); D. Prosser, *Palsgraf Revisited*, 52 Mich.L.Rev. 1, 15 (1953) ("These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it").

{¶ 44} The Ohio Supreme Court has held that "[s]uch a 'special relation' exists when one takes charge of a person whom he knows or should know is likely to cause bodily harm to others if not controlled.*" Littleton v. Good Samaritan Hosp.*

*& Health Ctr.,* 39 Ohio St.3d 86, 92, 529 N.E.2d 449 (1988). Turning to the case at hand, the extent to which social media companies "take charge" of their users is unknown at this time. However, as the oft-quoted saying goes, "negligence is in the air." *See* Dipayan Ghosh and Ben Scott, *Facebook's New Controversy Shows How Easily Online Political Ads Can Manipulate You,* Time Magazine (Mar. 19, 2018) https://time.com/5197255/facebook-cambridge-analytica-donald-trump-ads-data/ (accessed Sept. 24, 2020) ("The real story is about how personal data from social media is being used by companies to manipulate voters and distort democratic discourse"); Robert Creamer, *Massive Facebook influence on public opinion makes its ad policy a serious election threat,* USA Today (Jan. 22, 2020) https://www.usatoday.com/story/opinion/2020/01/22/facebook-political-ads-policy-danger-ous-for-democracy-column/4529880002/ (accessed Sept. 24, 2020) (Facebook "has massive monopoly power to influence public opinion").

{¶ 45} In fact, social media is becoming so influential that being a social media influencer is now a profession. *See Jianming Jyu v. Ruhn Holdings Ltd.*, N. Y. S.Ct., N. Y. Cty. No. 655420/2019, 2020 N. Y. Misc. LEXIS 2250 (Apr. 22, 2020) (defining "social media influencers" as "individuals who create content on social media platforms such as Facebook, YouTube, Tik Tok, and Instagram with the hope of garnering a large public following [and] who are paid to promote, market, and advertise products and services to their fans and followers"). Recently, Mark Zuckerberg, who is Facebook's CEO, admitted that "Facebook made a mistake in not removing a militia group's page earlier this week that called for armed civilians to

enter Kenosha, Wisconsin, amid violent protests after police shot Jacob Blake * * *." Christopher Rugaber, *Zuckerberg says Facebook erred in not removing militia post*, ABC News (August 29, 2020) https://abcnews.go.com/ Business/ wireStory/zuckerberg-facebook-erred remov-ing-militia-post-72702521 (accessed Sept. 24, 2020).

{¶ 46} As a matter of policy, public safety should be of primary concern, which is why we have tort law. I truly do not see Facebook's issue. It had information of a potential crime. By acting it might have saved a life. Of course, we will never know, but that is why we give individuals their day in court.

{¶ 47} I fully agree with the majority opinion that "[t]his case arises from disturbing facts [stemming] from the senseless murder of Robert Godwin, Sr., * * *." Although the law may not be ready to hold Facebook accountable in the instant case, from a moral point of view, it is hard to ignore "the principle that for every wrong a remedy must exist * * *." *Hull v. Cleveland*, 79 Ohio App. 87, 91, 70 N.E.2d 137 (8th Dist. 1946). Only when legal and moral duty diverge can courts hear a call for movement and reform.